Furman v Desimone (2020 NY Slip Op 01430)





Furman v Desimone


2020 NY Slip Op 01430


Decided on February 27, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 27, 2020

529266

[*1]Cynthia L. Furman et al., Respondents,
v
Jeffrey Desimone et al., Defendants, and Rao Kamani, Appellant.

Calendar Date: January 8, 2020

Before: Egan Jr., J.P., Lynch, Clark, Aarons and Reynolds Fitzgerald, JJ.


Smith, Sovik, Kendrick & Sugnet, PC, Syracuse (Karen G. Felter of counsel), for appellant.
Schlather, Stumbar, Parks & Salk, LLP, Ithaca (Diane V. Bruns of counsel), for respondents.



Egan Jr., J.P.
Appeal from an order of the Supreme Court (Faughnan, J.), entered December 26, 2018 in Tompkins County, which, among other things, denied defendant Rao Kamani's motion for summary judgment dismissing the complaint against him.
In October 2011, plaintiff Cynthia L. Furman consulted with defendant Jeffrey DeSimone, a general and bariatric surgeon, regarding the various options available to her for bariatric surgery. As part of the consultation, DeSimone recommended, and Furman agreed, to undergo a laparoscopic sleeve gastrectomy, a surgical procedure involving the removal of approximately two thirds to three quarters of a patient's stomach. On the morning of April 2, 2012, DeSimone performed the subject surgery at Crouse Hospital with the assistance of defendant Kenneth Cooper, a fellow surgeon, and two employees of CNY Anesthesia (hereinafter CNYA), defendant Rao Kamani, an anesthesiologist, and Maria Araujo, a certified registered nurse anesthetist (hereinafter CRNA). At the beginning of the surgery, Araujo inserted a surgical bougie [FN1] and an esophageal temperature probe [FN2] into Furman's stomach. During the course of the surgery, both devices were inadvertently stapled to Furman's stomach, requiring immediate dissection and repair.
Furman and her husband, derivatively, thereafter commenced this medical malpractice action against, among others, Crouse Hospital,[FN3] DeSimone, Cooper, Kamani and "CRNA, Jane Doe (a fictitious person)."[FN4] Following joinder of issue, Kamani moved for summary judgment dismissing the complaint against him. Supreme Court denied the motion, determining that, as the supervising anesthesiologist, he maintained responsibility for the anesthesia care team and that questions of fact remained regarding, among other things, whether he deviated from the accepted standards of care for a supervising anesthesiologist and whether said deviation was the proximate cause of Furman's injuries. Kamani appeals, and we affirm.
As the proponent of the motion for summary judgment, Kamani bore the initial burden of establishing that he did not deviate from the accepted standards of practice in treating Furman or, if he did so, that such deviation was not the proximate cause of Furman's injuries (see Butler v Cayuga Med. Ctr., 158 AD3d 868, 869 [2018]; Weeks v St. Peter's Hosp., 128 AD3d 1159, 1160 [2015]). If a prima facie case is established, the burden then shifts to plaintiffs to come forward with proof demonstrating Kamani's deviation from accepted medical practice and that such alleged deviation was the proximate cause of Furman's injuries (see Yerich v Bassett Healthcare Network, 176 AD3d 1359, 1361 [2019]; Gallagher v Cayuga Med. Ctr., 151 AD3d 1349, 1354 [2017]; Derusha v Sellig, 92 AD3d 1193, 1194 [2012]).
In support of his motion, Kamani submitted, among other things, his own affidavit and deposition testimony. According to Kamani, at the time of Furman's surgery, he was both a shareholder and employee of CNYA and that CNYA based its practice on the anesthesia care team (hereinafter ACT) model, which "contemplates a highly supervised environment where a physician medically directs two or three concurrent procedures involving qualified individuals." Specifically, Kamani indicated that his practice "includes the supervision of [CRNAs] in the provision of key portions of anesthetic care to patients during surgeries," including pre-evaluation, induction, emergence or extubation, and certain other monitoring duties depending on the type of surgery. Although Kamani averred that he has no specific recollection of Furman's surgery, he indicated that, per his usual custom and practice as a supervising anesthesiologist, he was present with Araujo for Furman's induction and the placement of her breathing tube, but was not present for either the placement or removal of the bougie or esophageal temperature probe. Kamani averred that placement and removal of these devices did not constitute "key portions" of the subject surgery and that the requisite standard of care did not require his direct supervision of Araujo at the time that these devices were placed and/or removed by her, as said devices were to be removed at the specific direction and control of the surgeon. According to Kamani, the inadvertent stapling of the bougie and temperature probe was "exclusively a surgical complication, which had no relationship to the anesthetic care rendered" by either he or Araujo and, in his opinion, said care was reasonable, appropriate and within the standard of care. He further avers that there was no causal relationship between his alleged failure to supervise Araujo and Furman's alleged injuries.
Assuming, without deciding, that Kamani's affidavit was sufficient to meet his initial burden on his motion, the affidavit of Louis Flancbaum, a board-certified surgeon, and deposition testimony of DeSimone, Cooper and Araujo created triable issues of fact precluding summary judgment in Kamani's favor. According to Flancbaum, the relevant ACT standards referenced by Kamani provide that, "[a]lthough selected tasks of overall anesthesia care may be delegated to qualified members of the [ACT], overall responsibility for the [ACT] and patients' safety ultimately rests with the anesthesiologist." These standards further mandate that, as supervising anesthesiologist, it was Kamani's duty to ensure that Araujo was "appropriately skilled . . . for each patient and procedure." Flancbaum opined that, having reviewed the relevant medical records and deposition testimony in this case, Kamani deviated from these standards by (1) failing to communicate with DeSimone prior to the subject procedure to develop and review the plan for the subject procedure, (2) failing to communicate with and ensure that Araujo — who had not previously worked with DeSimone on a laparoscopic sleeve gastrectomy — was familiar with DeSimone's procedures and expectations, particularly the fact that DeSimone preferred and expected the use of a noninvasive skin temperature probe as opposed to an esophageal temperature probe, and (3) failing to ensure that Araujo had the requisite skill and knowledge to appropriately remove the esophageal temperature probe in a timely manner (i.e., to avoid the very complication presently at issue).[FN5] Flancbaum further opined that Kamani's failures in this regard departed from acceptable standards of medical care applicable to his role as a supervising and attending anesthesiologist and that such departure was a contributing cause of Furman's injuries.
Although Kamani correctly asserts that he may not be held vicariously liable for Araujo's conduct to the extent that he lacked the authority to select, control and discharge her as an employee (see Connell v Hayden, 83 AD2d 30, 50-51 [1981]), the fact remains that she was under his supervision while providing the subject anesthesia services and, therefore, he may be held liable in his capacity as supervising anesthesiologist for not only his own negligent conduct, but hers as well (see Business Corporation Law § 1505 [a]; Ruggiero v Miles, 125 AD3d 1216, 1217 [2015]; Wise v Greenwald, 208 AD2d 1141, 1142 [1994]; see also Turcsik v Guthrie Clinic, Ltd., 12 AD3d 883, 886 [2004]). Additionally, we are unpersuaded by Kamani's contention that Flancbaum's expert affidavit was speculative, conclusory and insufficient to defeat summary judgment. Contrary to Kamani's assertion, the specialized skills and expertise of Flancbaum were sufficiently set forth in his affidavit, and any alleged lack of skill or experience would go to the weight to be given to Flancbaum's opinion, not its admissibility (see Carter v Tana, 68 AD3d 1577, 1580 [2009]). Based on the evidence presented, a question of fact remains as to whether Kamani's conduct deviated from accepted medical practice and whether such deviation was a proximate cause of Furman's injuries. Accordingly, Supreme Court properly denied Kamani's motion for summary judgment dismissing the complaint against him.
Lynch, Clark, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the order is affirmed, with costs.



Footnotes

Footnote 1: A bougie is a medical sizing device in the form of a flexible tube that is inserted through the mouth and into the stomach to help guide surgeons while dividing the stomach during a sleeve gastrectomy.

Footnote 2: An esophageal temperature probe is a device inserted into the body cavity during surgery to measure core body temperature.

Footnote 3: By stipulation, plaintiffs subsequently discontinued its action against the hospital.

Footnote 4: Although Araujo was not specifically named in the complaint and plaintiffs failed to subsequently move to amend the caption to add her as a party, Supreme Court dismissed the complaint against her. The court determined that Araujo had never been properly identified, and plaintiffs failed to demonstrate that they had made efforts to determine her identity prior to the expiration of the statute of limitations.

Footnote 5: Araujo testified that, although she had previously worked with DeSimone on general surgeries, she had not previously worked with him on a laparoscopic sleeve gastrectomy. She further testified that neither Kamani nor DeSimone had informed her that a noninvasive skin temperature probe should be used for this type of surgery, as opposed to an esophageal temperature probe, nor was she ever trained that an esophageal temperature probe must be removed prior to the surgeon's use of a stapling device.