Leberman v Glick (2022 NY Slip Op 04489)

Leberman v Glick

2022 NY Slip Op 04489

Decided on July 8, 2022

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 8, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: LINDLEY, J.P., NEMOYER, CURRAN, WINSLOW, AND BANNISTER, JJ.

495 CA 21-00597

[*1]WILLIAM J. LEBERMAN, CHAPTER 7 TRUSTEE, ON BEHALF OF PATRICIA M. MILLER, PLAINTIFF-RESPONDENT,
v
SCOTT GLICK, M.D., OSWEGO HOSPITAL, DEFENDANTS-APPELLANTS, ET AL., DEFENDANTS. 

CONNORS LLP, BUFFALO (MICHAEL J. ROACH OF COUNSEL), FOR DEFENDANT-APPELLANT SCOTT GLICK, M.D. 
MARTIN, GANOTIS, BROWN, MOULD & CURRIE, P.C., DEWITT (GABRIELLE L. BULL OF COUNSEL), FOR DEFENDANT-APPELLANT OSWEGO HOSPITAL.
GILLETTE & IZZO LAW OFFICE PLLC, SYRACUSE (JANET M. IZZO OF COUNSEL), FOR PLAINTIFF-RESPONDENT. 

 Appeals from an order of the Supreme Court, Oswego County (Gregory R. Gilbert, J.), entered March 23, 2021. The order denied the motions of defendants Scott Glick, M.D. and Oswego Hospital for summary judgment. 
It is hereby ORDERED that the order so appealed from is unanimously affirmed without costs.
Memorandum: In this medical malpractice action seeking damages for injuries that Patricia M. Miller allegedly sustained as a result of defendants' negligence in failing to recognize that she was or would soon be suffering from a stroke and to provide appropriate treatment for that condition, Oswego Hospital (hospital) and Scott Glick, M.D. (defendants) each appeal from an order that denied their respective motions for summary judgment dismissing the complaint against them. We affirm.
Miller, an employee of the hospital, was brought to the hospital's emergency department approximately 90 minutes after the start of her evening shift because a coworker observed that Miller was displaying symptoms that were possibly indicative of a stroke. Miller presented at the emergency department with, inter alia, dizziness, weakness, and a headache, all of which had a sudden onset. Glick examined Miller and, inter alia, ordered a CT scan of Miller's brain. Another doctor at the hospital reviewed the CT scan, which he interpreted as normal. Based on his examination of Miller and the results of the CT scan, Glick concluded that Miller did not present with any stroke-like symptoms. Ultimately, Glick diagnosed Miller with a urinary tract infection based on the results of other tests performed at the hospital. Because Miller's other symptoms appeared to have resolved, Glick discharged Miller from the hospital approximately five hours after she presented at the emergency room. A day later, Miller woke up on the floor of her bedroom, unable to get up. She was taken to another hospital, where she was diagnosed as having suffered a moderate-sized acute right middle cerebral artery infarction—i.e., a stroke.
We reject defendants' contentions that Supreme Court erred in denying their motions. Preliminarily, there is no dispute that defendants met their initial burden on their respective motions by submitting the affidavits of Glick and an expert neurologist, who addressed each of the factual allegations of negligence raised in the bill of particulars (see Groff v Kaleida Health, 161 AD3d 1518, 1520 [4th Dept 2018]) and established that defendants did not deviate from the [*2]applicable standard of care and that any purported deviation was not a proximate cause of Miller's injuries (see Isensee v Upstate Orthopedics, LLP, 174 AD3d 1520, 1521 [4th Dept 2019]; Occhino v Fan, 151 AD3d 1870, 1871 [4th Dept 2017]; Bickom v Bierwagen, 48 AD3d 1247, 1247 [4th Dept 2008]).
Contrary to defendants' contentions, however, plaintiff raised triable issues of fact sufficient to defeat the motions by submitting, inter alia, expert affidavits establishing "both that defendants deviated from the applicable standard of care and that such deviation was a proximate cause of [Miller's] injuries" (Occhino, 151 AD3d at 1871; see Bickom, 48 AD3d at 1247; see generally Bubar v Brodman, 177 AD3d 1358, 1359 [4th Dept 2019]). At the outset, we reject defendants' contentions that the opinions of plaintiff's experts were insufficient to raise an issue of fact with respect to defendants' deviation from the applicable standard of care because they relied on practice guidelines—in this case a stroke scale—to assist in establishing the relevant standard of care. The experts' reliance on a stroke scale to establish the relevant standard of care was not improper here because the practice guidelines were not offered as the sole evidence of the standard of care in opposition to defendants' motions (cf. Spensieri v Lasky, 94 NY2d 231, 238-239 [1999]; see generally Hinlicky v Dreyfuss, 6 NY3d 636, 647 [2006]; Diaz v New York Downtown Hosp., 99 NY2d 542, 544-545 [2002]). It is undisputed that plaintiff's experts had "the requisite skill, training, education, knowledge or experience from which it can be assumed that [the experts'] opinion[s] rendered . . . [are] reliable" (Stradtman v Cavaretta [appeal No. 2], 179 AD3d 1468, 1470 [4th Dept 2020] [internal quotation marks omitted]; see Payne v Buffalo Gen. Hosp., 96 AD3d 1628, 1629-1630 [4th Dept 2012]). Based on that foundation, both experts stated their opinion that using a stroke scale during the neurological examination of a suspected stroke patient was necessary to satisfy the standard of care. Indeed, Glick's affidavit and deposition testimony, which we accept as true insofar as it favors the nonmoving party (see Bunk v Blue Cross & Blue Shield of Utica-Watertown, 244 AD2d 862, 862-863 [4th Dept 1997]), also supported reliance on a stroke scale as a generally-accepted standard or practice in diagnosing and treating strokes. Consequently, we conclude that it was not inappropriate for plaintiff's experts to rely, at least in part, on a stroke scale to establish the relevant standard of care for diagnosing and treating a patient presenting with stroke-like symptoms in opining that defendants deviated from that standard of care. To the extent defendants argue that plaintiff's experts improperly relied on outdated practice guidelines, we conclude that issue goes to the weight to be given to the experts' opinions, rather than their admissibility (see generally Revere v Burke, 200 AD3d 1607, 1609 [4th Dept 2021]; Anderson v House of Good Samaritan Hosp., 44 AD3d 135, 143 [4th Dept 2007]).
We further conclude that plaintiff's experts raised questions of fact with respect to causation. Under the circumstances of this case involving the loss of chance theory of causation, we reject defendants' contentions that the experts were required to precisely explain how or why specific tests or therapies would have improved Miller's outcome (cf. Martingano v Hall, 188 AD3d 1638, 1640 [4th Dept 2020], lv denied 36 NY3d 912 [2021]). The loss of chance theory of causation applicable to the facts of this case requires only that a plaintiff "present evidence from which a rational jury could infer that there was a 'substantial possibility' that the patient was denied a chance of the better outcome as a result of the defendant's deviation from the standard of care" (Clune v Moore, 142 AD3d 1330, 1331-1332 [4th Dept 2016]; see Wolf v Persaud, 130 AD3d 1523, 1525 [4th Dept 2015]). Here, plaintiff's neurological expert opined that defendants' failure to perform a comprehensive neurological examination and to evaluate Miller as a candidate for fibrinolytic therapy, which would have minimized the damage caused by the stroke had they been done when Miller first presented with her symptoms, deprived Miller of "a substantially improved likelihood of achieving recovery from the infarct and a significantly less debilitating outcome." Plaintiff's neurological expert also opined that defendants' failure to order a more sensitive diagnostic test than the CT scan—i.e., an MRI or MRA—which would have resulted in an earlier detection of the stroke, likely resulted in the stroke doubling in size and rendered Miller ineligible for certain treatments. In short, the neurological expert's opinion was neither conclusory nor speculative (see Stradtman, 179 AD3d at 1471; Clune, 142 AD3d at 1332). The affidavit of the expert neurologist provides a "rational basis" for his opinions regarding the "probability" of a better outcome and, thus, "[t]he probative force of [his] opinion is not to be defeated by semantics" (Nowelle B. v Hamilton Med., Inc., 177 AD3d 1256, 1258 [4th Dept 2019] [internal quotation marks omitted]; see Cooke v Corning Hosp., 198 AD3d 1382, 1383-1384 [4th Dept 2021]). Ultimately, the conflicting expert opinions about whether certain tests or therapies would have improved Miller's outcome present "a classic battle of the [*3]experts that is properly left to a jury for resolution" (Mason v Adhikary, 159 AD3d 1438, 1439 [4th Dept 2018] [internal quotation marks omitted]; see Hilbrecht v Greco, 189 AD3d 2073, 2074 [4th Dept 2020]; Blendowski v Wiese [appeal No. 2], 158 AD3d 1284, 1286 [4th Dept 2018]).
We have reviewed defendants' remaining contentions and conclude that none warrants modification or reversal of the order.
Entered: July 8, 2022
Ann Dillon Flynn
Clerk of the Court