Sovocool v Cortland Regional Med. Ctr. (2023 NY Slip Op 03826)

Sovocool v Cortland Regional Med. Ctr.

2023 NY Slip Op 03826

Decided on July 13, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 13, 2023

535338
[*1]Alyssa Sovocool et al., Individually and as Executors of the Estate of Karen Sovocool, Deceased, Appellants,
v
Cortland Regional Medical Center et al., Respondents.

Calendar Date:June 1, 2023

Before:Egan Jr., J.P., Lynch, Aarons, Fisher and McShan, JJ.

DeFrancisco & Falgiatano, LLP, East Syracuse (Charles L. Falgiatano of counsel), for appellants.
Levene Gouldin & Thompson, LLP, Vestal (Justin L. Salkin of counsel), for Cortland Regional Medical Center and others, respondents.
Brown, Gruttadaro & Prato, PLLC, Rochester (John M. Coniglio of counsel), for Estate of Hasan Zakariyya, respondent.

Lynch, J.
Appeal from an order of the Supreme Court (Mark G. Masler, J.), entered April 12, 2022 in Cortland County, which granted defendants' motions for summary judgment dismissing the complaint.
On October 18, 2017, at approximately 6:30 p.m., Karen Sovocool (hereinafter decedent) presented to the emergency department of defendant Cortland Regional Medical Center (hereinafter CRMC) complaining of severe "right upper quadrant epigastric" pain. On October 19, 2017, following an initial diagnostic assessment of gallstone pancreatitis, decedent was placed under general anesthesia and underwent an endoscopic retrograde cholangiopancreatography. At approximately 4:35 p.m., decedent was transferred to the post-anesthesia care unit (hereinafter PACU) under the supervision of defendant Mervat Eid — an anesthesiologist — at which time decedent's vital signs were within normal limits.
In the PACU, decedent was lethargic and struggled to awaken from anesthesia. To address this, decedent was placed on a non-rebreather oxygen mask, which kept decedent's oxygen saturation levels (hereinafter OSLs) in the 80s and 90s. At 5:59 p.m., Eid evaluated decedent and, although she was looking around and breathing comfortably, she was not verbally responsive, her OSLs were at 92%, her pulse was low, and her blood pressure was elevated. Defendant Hameed Iqbal — a hospitalist — examined decedent at 6:44 p.m., at which point decedent was responding to painful stimuli and opening her eyes. Decedent's current reactivity, coupled with her ability to maintain OSLs around 95%, led Iqbal to believe that intubation was not necessary at that point. Iqbal ordered decedent to be administered Narcan, a "reversal for . . . sedatives," and ordered blood tests to analyze decedent's arterial blood gasses. Both Eid and Iqbal believed that decedent was unable to metabolize the sedation due to her severe pancreatitis and acute liver injury.
At approximately 8:00 p.m., decedent was transferred to the Intensive Care Unit (hereinafter ICU) under the care of defendant Hasan Zakariyya [FN1] — another hospitalist —where her OSLs continued to decline. At 10:08 p.m., decedent's OSLs dropped into the 80s and she was "holding breath," at which point a rapid response was initiated. When Zakariyya arrived, staff was using a bag valve mask to pump air into decedent's lungs. Zakariyya then placed decedent back on a non-rebreather mask, which brought decedent's OSLs to around 92%. By 11:48 p.m., a second rapid response was called after decedent's OSLs had dropped to 75%. At 12:43 a.m. on October 20, 2017, Zakariyya authorized decedent to be intubated and placed on a ventilator. At approximately 1:30 a.m., decedent underwent a CT scan which did not reveal any evidence of brain injury.
Decedent's condition continued to deteriorate and, later that day, doctors suspected that she was in multisystem organ failure likely due to sepsis caused by necrotizing pancreatitis and acute respiratory distress syndrome (hereinafter [*2]ARDS). Decedent was airlifted to Crouse Hospital for supportive care, where she suffered a grand mal seizure the next day and was confirmed to have a severe ischemic anoxic brain injury. Upon consulting with doctors, decedent's family made the decision to extubate her and she was provided with palliative care until she passed away two days later. An autopsy performed on October 24, 2017 showed the existence of an anoxic brain injury that was approximately two to five days old, as well as acute necrotizing pancreatitis and septicemia, among other conditions. Decedent's death certificate lists the cause of death as anoxic brain injury "due to or as a consequence of [ARDS]" and severe pancreatitis.
Plaintiffs — individually and as the executors of decedent's estate — commenced this action against CRMC and the medical professionals who treated decedent throughout her hospitalization, asserting claims for wrongful death and medical malpractice. As relevant here, plaintiffs alleged that Eid, Iqbal and Zakariyya committed medical malpractice by failing to timely intubate decedent upon her admission to the PACU or earlier in the ICU, resulting in the development of ARDS and, ultimately, her premature death.[FN2] Following joinder of issue and discovery, defendants moved for summary judgment,[FN3] arguing that the failure to intubate decedent at an earlier point in her treatment was not a departure from the accepted standard of medical care and was not a proximate cause of her death. Supreme Court granted defendants' motions and dismissed the complaint, finding that defendants met their prima facie burden to establish "that they did not depart from acceptable standards of care or that any such departure did not cause the injury" through expert opinion evidence that intubating decedent at an earlier point in her care was neither indicated nor appropriate, and that decedent's death arose solely from the progression of acute necrotizing pancreatitis, which could not have been prevented by earlier intubation. Although the court found that plaintiffs satisfied their transferred burden to show a triable issue of fact as to whether the failure to intubate decedent at an earlier point in her treatment constituted a deviation from the standard of care, it ultimately concluded that their experts' opinions on causation were too "conclusory and speculative" to create an issue of fact in that regard. Plaintiffs appeal.
We reverse. "Since [summary judgment] deprives [a] litigant of [their] day in court[,] it is considered a drastic remedy which should only be employed when there is no doubt as to the absence of triable issues [of fact]" (Andre v Pomeroy, 35 NY2d 361, 364 [1974] [citation omitted]). "When considering a motion for summary judgment, courts must view the evidence in a light most favorable to the nonmoving party and accord that party the benefit of every reasonable inference from the record proof, without making any credibility determinations" (American Food & Vending [*3]Corp. v Amazon.com, Inc., 214 AD3d 1153, 1154-1155 [3d Dept 2023] [internal quotation marks and citations omitted]; see Williams v Beemiller, Inc., 33 NY3d 523, 529 [2019]).
On their motions for summary judgment in this medical malpractice case, defendants had to demonstrate that "they did not deviate from accepted medical practice or that any such deviation was not a proximate cause of [decedent's] injury" (Busch v Sherman, 209 AD3d 1230, 1231 [3d Dept 2022]; see Cho-Bodnar v Adirondack Maxillofacial Surgery, 215 AD3d 1101, 1102-1103 [3d Dept 2023]; Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1078 [3d Dept 2023]). "If a prima facie case is established, the burden then shifts to plaintiff[s] to come forward with proof demonstrating [defendants'] deviation from accepted medical practice and that such alleged deviation was the proximate cause of [decedent's] injuries" (Cole v Chun, 185 AD3d 1183, 1186-1187 [3d Dept 2020] [internal quotation marks and citations omitted]; see Fischella v Saint Luke's Cornwall Hospital, 204 AD3d 1343, 1344 [3d Dept 2022]).
Initially, we agree with Supreme Court's determination that defendants met their prima facie burden. Defendants presented affidavits from three medical experts, who all opined, within a reasonable degree of medical certainty, that the failure to intubate decedent in the PACU or earlier in the ICU was not a deviation from the accepted standard of medical care and was not a proximate cause of her death. As to causation, these experts agreed that decedent's death was caused by Systemic Inflammatory Response Syndrome (hereinafter SIRS), secondary to pancreatitis, which would have led to decedent's death regardless of whether she had been intubated at an earlier point in her treatment. One expert stated that, based on a clinical tool called the Rankin Score, decedent's mortality risk from her gallstone pancreatitis alone was at least 15%. The experts further opined that even if decedent had been intubated sooner, it "would not have stopped the natural progression of her pancreatitis into multisystem organ failure." It was specifically noted that decedent was appropriately treated at each of the "rapid response" encounters and that, following intubation, the CT scan "revealed no intracranial abnormality."
As defendants met their prima facie burden, the burden shifted to plaintiffs to raise a triable issue of fact in opposition (see Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1078-1080; Busch v Sherman, 209 AD3d at 1231-1232; Longtemps v Oliva, 110 AD3d 1316, 1317-1318 [3d Dept 2013]). Insofar as Supreme Court determined that plaintiffs demonstrated a triable issue of fact as to whether the failure to intubate decedent earlier in her treatment was a deviation from the accepted standard of medical care, the sole remaining question is whether the court erred in rejecting plaintiffs' experts' opinions on causation as too speculative and conclusory to defeat defendants' prima facie [*4]showing. We conclude that the court erred in this respect.
In opposition to defendants' motions, plaintiffs submitted redacted affidavits from an anesthesiologist and an internist. With respect to Eid's postoperative treatment, the anesthesiologist opined that he deviated from the standard of care by not intubating decedent in the PACU, explaining that decedent's "normal" OSLs upon admission to CRMC, which were at "98% on room air," decreased to 90% while in the PACU "even with significant supplemental oxygen including a non-rebreather mask." The anesthesiologist furthered noted that the pressure of oxygen in decedent's blood had correspondingly decreased "significantly lower than one would anticipate with supplemental oxygen," qualifying decedent as having reached "critical respiratory failure" by that point. The anesthesiologist opined that decedent's respiratory state, coupled with a serious postoperative infection and "mental status changes" warranted intubation to prevent sepsis and generally opined that the failure to do so was a "substantial factor in causing harm and ultimately death to [decedent]."
The internist agreed with this assessment and gave a more detailed opinion on causation. Upon reviewing the medical evidence and the affirmations of defendants' experts, the internist concluded that decedent "died from an anoxic brain injury caused by her septic shock and ARDS" and that the "anoxic injury was a direct result of the repeated failure to secure her airway and breathing; not once, but on several occasions, throughout her post-operative course." In direct contradiction to Iqbal's expert, the internist opined that intubation should have been authorized by Iqbal after he observed that Narcan, a medication used to immediately reverse the effects of anesthesia, did not alter decedent's lethargic state. Turning to Zakariyya, the internist noted that decedent's "failure to arouse from anesthesia[, coupled with] her state of septic shock," warranted intubation to protect decedent's airway in order to prevent further damage. The internist then specified that during the second rapid response, decedent went into respiratory failure and that after decedent was resuscitated and intubated, her respiratory status continued to deteriorate "as she developed septic shock and ARDS, with increasing oxygen and pressor requirements." Considering such, the internist opined, within a reasonable degree of medical certainty, that if decedent's airway had been "timely and properly protected . . . within the PACU or during the ICU period, prior to the rapid response team being called for a second time just prior to midnight on October 19, 2017, more likely than not [decedent's] clinical condition would have improved . . . , her sepsis, respiratory distress and ARDS would have been able to be treated and her injuries, including the anoxic brain injury/damage that occurred, would not have occurred," estimating that earlier intubation would have given her a[*5]"70% chance of survival."
In concluding that the internist's opinions on causation were conclusory and speculative, Supreme Court emphasized that that the internist "failed to (1) acknowledge or address the significant risk of death which [decedent] faced from pancreatitis and SIRS alone; (2) identify a specific course of treatment that could have been administered to [her] that would have successfully prevented progression of SIRS and multisystem organ failure which defendants' experts unanimously opined was irreversible; (3) explain how treatment for pancreatitis and SIRS could have been effective had she been intubated sooner . . . or (4) address defendants' evidence showing that [she] did not suffer any brain injury prior to intubation." In our view, however, the internist's affidavit is sufficient to warrant a trial on the matter.
Although plaintiffs' experts failed to specifically address how intubation would have slowed the effects of decedent's quickly evolving acute pancreatitis or SIRS, or increased decedent's chance of survival (see Schwarz v Partridge, 179 AD3d 963, 964-965 [2d Dept 2020]), plaintiffs are proceeding upon a loss of chance theory of causation, which has less onerous requirements (see IB NY PJI3d 2:150 at 88-93 [2023]; 2:150.1). This theory of causation, predicated upon a negligent omission (see Wild v Catholic Health Sys., 85 AD3d 1715, 1717 [4th Dept 2011] [concluding that loss of chance jury instruction on causation is appropriate for omission theories, but not commission theories], affd 21 NY3d 951 [2013]), does not require a precise explanation of "how or why specific tests or therapies would have improved [decedent's] outcome" (Leberman v Glick, 207 AD3d 1203, 1206 [4th Dept 2022]; see Wild v Catholic Health Sys., 85 AD3d at 1717). Rather, it requires only that a plaintiff "present evidence from which a rational jury could infer that there was a substantial possibility that the patient was denied a chance of the better outcome as a result of the defendant's deviation from the standard of care" (Leberman v Glick, 207 AD3d at 1206 [internal quotation marks and citation omitted]; see Lopes v Lenox Hill Hosp., 172 AD3d 699, 702 [2d Dept 2019]; D.Y. v Catskill Regional Med. Ctr., 156 AD3d 1003, 1005 [3d Dept 2017]; Neyman v Doshi Diagnostic Imaging Services, P.C., 153 AD3d 538, 545 [2d Dept 2017]).
Here, the internist specifically opined that earlier intubation in the PACU or ICU would have produced a "70% chance of survival" by preventing the anoxic brain injury and allowing the sepsis, respiratory distress and ARDS symptoms to be treated. The internist also stated that earlier intubation would have made it "more likely than not" that decedent's "clinical condition would have improved." When giving plaintiffs the benefit of all reasonable inferences as the nonmoving parties, a rational juror could infer that decedent would have had a better chance at recovering from the necrotizing pancreatitis and related sepsis and [*6]ARDS if she had been intubated in the PACU or ICU prior to the second rapid response event (see generally Toth v Community Hosp. at Glen Cove, 22 NY2d 255, 261 [1968] ["The issue of causation in medicine is always difficult but, when it involves the effect of a failure to follow a certain course of treatment, . . . (the courts) can then only deal in probabilities since it can never be known with certainty whether a different course of treatment would have avoided the adverse consequences"]). Thus, we conclude that the internist's affidavit was sufficient to raise a triable issue of fact as to causation, warranting denial of defendants' summary judgment motion (see Holland v Cayuga Med. Ctr. at Ithaca, Inc., 195 AD3d 1292, 1295 [3d Dept 2021]; D'Orta v Margaretville Mem. Hosp., 154 AD3d 1229, 1233 [3d Dept 2017]; Hernandez v New York City Health and Hosp. Corp., 129 AD3d 532, 532 [1st Dept 2015]). In light of our determination, it follows that the claim against CRMC premised upon vicarious liability was also improperly dismissed.
Egan Jr., J.P., Aarons, Fisher and McShan, JJ., concur.
ORDERED that the order is reversed, without costs, and defendants' motions denied.

Footnotes

Footnote 1: Zakariyya subsequently passed away and the caption was amended to name his estate as a defendant. 

Footnote 2: The claims against the other defendant doctors named in the complaint were discontinued by voluntary stipulation.
Footnote 3: By this point, the only claim remaining against CRMC was premised upon a theory of vicarious liability.