Lubrano-Birken v Ellis Hosp. (2024 NY Slip Op 03573)

Lubrano-Birken v Ellis Hosp.

2024 NY Slip Op 03573

Decided on July 3, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 3, 2024

CV-23-1020
[*1]Brenda Lubrano-Birken et al., as Co-Administrators of the Estate of H.L.B., Deceased, Appellants,
v
Ellis Hospital et al., Respondents.

Calendar Date:June 4, 2024

Before:Egan Jr., J.P., Clark, Reynolds Fitzgerald, McShan and Powers, JJ.

Powers & Santola, LLP, Albany (Amber L. Wright of counsel), for appellants.
Thorn Gershon Tymann and Bonanni, LLP, Albany (Marshall S. Broad of counsel), for respondents.

Clark, J.
Appeal from an order of the Supreme Court (Christina L. Ryba, J.), entered April 20, 2023 in Albany County, which granted defendants' motion for summary judgment dismissing the complaint.
On the evening of August 21, 2015, H.L.B. (hereinafter decedent) went to defendant Ellis Hospital Medical Center of Clifton Park (hereinafter the urgent care) complaining of a rash on her right calf. Decedent reported that she first noticed the rash the day prior and believed it was the result of an insect bite as she had spent the last few weeks outdoors at a summer camp. Defendant Wayne Gravell, a physician assistant, examined decedent, diagnosed her with cellulitis secondary to an insect bite, prescribed the antibiotic Bactrim and discharged her. Defendant Laurie Wright, Gravell's supervising physician, never examined decedent but reviewed her chart and signed off on Gravell's evaluation and treatment of her. Decedent returned to the urgent care on August 27, 2015, presenting with additional symptoms and the minimally, if at all, improved rash on her leg. At this visit, decedent was examined by defendant Robert Rattner, a physician, who attributed all of decedent's new symptoms to strep throat, despite not obtaining a throat culture, and updated the diagnosis of her leg rash to contact dermatitis. Rattner prescribed the antibiotic Keflex as well as an antacid and steroid and discharged decedent.
The following day, decedent presented to her primary care physician with still worsening symptoms, including nausea and vomiting. While there, decedent's condition began to rapidly decline, and she was transported via ambulance to Albany Medical Center (hereinafter AMC). During transport, her providers noted a "large red blotchy rash with possible target appearance as you would see with [a] tick bite" present on her leg. While at AMC, decedent's condition continued to deteriorate. She began having seizures and multiple scans showed progressive brain swelling. The day after she arrived at AMC, an infectious disease consultation was ordered and, thereafter, decedent was placed on doxycycline to treat a potential tick-borne illness. Decedent eventually died as a result of brain edema on September 7, 2015. Bloodwork from her primary care physician and AMC depicted decedent as having a low white blood cell count, low blood platelet count and a high level of liver enzymes. She also tested negative for strep throat. She was tested for various tick-borne illnesses at her primary care physician's office and AMC as well as posthumously by the Centers for Disease Control and Prevention and the Department of Health, all of which came back negative. Ultimately, the actual cause of decedent's illness was never medically determined.
Plaintiffs, as the administrators of decedent's estate, commenced this action against defendant Ellis Hospital, the urgent care, Gravell, Wright and Rattner,[FN1] alleging that defendants failed to timely consider, test for and treat decedent for a tick-borne [*2]illness, thereby decreasing her chances for a better medical outcome. After issue was joined and discovery completed, defendants moved for summary judgment, arguing that they complied with the standard of care and that because the cause of decedent's death could not be determined, plaintiffs could not establish that any alleged departures from the standard of care were the proximate cause of decedent's death. Plaintiffs opposed the motion. Supreme Court found that defendants met their prima facie burden through expert testimony that Gravell, Wright and Rattner did not deviate from the applicable standard of care and that, if there was any such deviation, it was not the proximate cause of decedent's injuries. The court also found that the opinions of plaintiffs' experts were "speculative, conclusory, and lack[ed] the evidentiary support necessary to create a material question of fact." Consequently, Supreme Court granted defendants' motion and dismissed the complaint. Plaintiffs appeal.
"When considering a motion for summary judgment, courts must view the evidence in a light most favorable to the nonmoving party and accord that party the benefit of every reasonable inference from the record proof, without making any credibility determinations," and such should only be granted "when there is no doubt as to the absence of triable issues of fact" (Sovocool v Cortland Regional Med. Ctr., 218 AD3d 947, 949 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]). In a medical malpractice action, the moving party bears "the initial burden of presenting factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that they complied with the accepted standard of care or did not cause any injury to the patient" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1078 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see Cole v Chun, 185 AD3d 1183, 1186 [3d Dept 2020]; Humphrey v Riley, 163 AD3d 1313, 1314 [3d Dept 2018]). If this burden is satisfied, the burden then shifts to the nonmoving party to establish the existence of material questions of fact through "expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of [the] injury" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1080 [internal quotation marks and citation omitted]; see Mattison v OrthopedicsNY, LLP, 189 AD3d 2025, 2027 [3d Dept 2020]; Butler v Cayuga Med. Ctr., 158 AD3d 868, 874 [3d Dept 2018]). The medical opinion evidence submitted in opposition should not be speculative or conclusory but should "address specific assertions made by the physician's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1080 [internal quotation marks, brackets and citations [*3]omitted]; see Abruzzi v Maller, 221 AD3d 753, 756 [2d Dept 2023]; Holland v Cayuga Med. Ctr. at Ithaca, Inc., 195 AD3d 1292, 1295 [3d Dept 2021]). "Where, as here, the plaintiff[s] allege[ ] that the defendant[s] negligently delayed in diagnosing and treating a condition, proximate cause may be predicated on the theory that the defendant[s] 'diminished the patient's chance of a better outcome or increased the injury' " (D.Y. v Catskill Regional Med. Ctr., 156 AD3d 1003, 1005 [3d Dept 2017] [brackets omitted], quoting Wolf v Persaud, 130 AD3d 1523, 1525 [4th Dept 2015]). In such a situation, plaintiffs need only "present evidence from which a rational jury could infer that there was a substantial possibility that the patient was denied a chance of the better outcome as a result of the defendant[s'] deviation from the standard of care" (Sovocool v Cortland Regional Med. Ctr., 218 AD3d at 952 [internal quotation marks and citations omitted]; see D.Y. v Catskill Regional Med. Ctr., 156 AD3d at 1005).
Initially, plaintiffs do not challenge Supreme Court's determination that defendants met their prima facie burden. Although defendants submitted no independent expert opinions to establish the standard of care, the affidavits of Gravell, Wright and Rattner each noted that the standard of care for treatment at an urgent care facility for a patient with a suspected insect bite included: (1) obtaining an appropriate medical history and history of the illness; (2) obtaining a physical examination of the patient; (3) determining if testing is required; (4) developing a differential diagnosis — i.e., a list of possible conditions causing the patient's symptoms; and (5) developing a treatment plan. Additionally, they all noted that testing, including bloodwork, "may be" required for patients who present with, among other things, a fever of 100.4 degrees Fahrenheit or higher. Gravell indicated that he did not depart from this standard of care. At her first visit, decedent presented with a suspected insect bite and a history of having spent the last few weeks outdoors at a summer camp. She complained of no other symptoms and did not have a fever. As such, Gravell determined that further testing was not required. He acknowledged that a tick-borne illness was on his differential diagnosis list but that it was further down the list because patients with such illnesses typically present with additional symptoms, including fever, chills, muscle aches, fatigue and headaches. Accordingly, Gravell diagnosed decedent's rash as cellulitis secondary to an insect bite — largely based on the appearance of the rash — and elected to treat her with the antibiotic Bactrim. Regarding the second visit, Rattner also indicated that he did not depart from the standard of care. At this visit, decedent presented with the same rash and history of recent time spent outdoors but she also complained of new symptoms, including the appearance of a pink rash over other parts of her body, a sore [*4]throat, headaches, fever, chills and stomach cramps. Upon examination, Rattner recorded decedent as having swollen lymph nodes and a feverish temperature between 100.7 and 100.9 degrees. Despite decedent's fever, Rattner determined that further testing, including bloodwork, was not needed. Like Gravell before, Rattner acknowledged that a tick-borne illness was on his differential diagnosis list; however, and without lab testing to verify the diagnosis, Rattner attributed all of decedent's new symptoms to strep throat and updated the diagnosis of her rash to contact dermatitis. He prescribed the antibiotic Keflex — noting that decedent had taken Bactrim for six days with only mild improvement of her rash — as well as an antacid and steroid and discharged decedent.
Regarding causation, defendants submitted the affidavit of an expert physician, who opined, within a reasonable degree of medical certainty, that although decedent's symptoms and bloodwork, which showed a low white blood cell count, low platelet cell count and elevated liver enzymes, could have been explained by a tick-borne illness, "there are other infections, diseases or ailments that could have caused or contributed" to her death that are not treatable with doxycycline. As such, he opined that it could not be determined "with any degree of medical certainty" that doxycycline could have prevented decedent's death. As defendants' submissions established that they did not deviate from the standard of care and that, even if they had, their actions did not cause decedent's death, the burden shifted to plaintiffs to raise a triable issue of fact in opposition (see Sovocool v Cortland Regional Med. Ctr., 218 AD3d at 950).
Plaintiffs submitted affidavits from two experts — an emergency medicine physician and an infectious diseases physician — each of whom detailed the applicable standard of care. They indicated that when a patient presents with a suspected insect bite after having spent the last four weeks in the woods in an endemic tick zone, a provider should immediately begin treatment with doxycycline for suspected tick-borne illnesses. Accordingly, they suggested that Gravell's and Rattner's failure to do so were departures from the standard of care. Both experts highlighted that Gravell and Rattner each considered tick-borne illnesses on their lists of differential diagnoses yet did nothing to either rule those possibilities out or to treat decedent with the appropriate antibiotic — doxycycline. The experts further agreed that the delay in treating decedent with doxycycline caused her death, which was likely from Lyme disease with co-infections resulting from the suspected tick bite on her leg. The infectious diseases physician explained that the negative tick-borne illness test results did not eliminate the possibility that decedent had such illness, as it may take several weeks of illness before sufficient antibodies are built up to render a positive test result. Notably, Gravell agreed [*5]with this notion, asserting that tick-borne illness tests often render false negatives during the early course of the illness and that it is therefore better to treat the symptoms first and confirm a diagnosis later. Ultimately, the infectious diseases physician concluded that the "definitive clinical evidence" in decedent's medical history — including the rash, recent time spent outdoors, progressive symptoms following her first urgent care visit and blood test results indicating low white blood cell count, low platelet cell count and high liver enzymes — indicated that decedent suffered from a tick-borne illness and, thus, should have been treated with doxycycline.
Upon this record, we find that Supreme Court erroneously determined that plaintiffs' experts were too speculative and conclusory. On the contrary, their opinions that decedent likely had one or more tick-borne illnesses are supported by the medical records. Throughout the course of decedent's illness and treatment, defendants were aware that she had spent significant time at an outdoor camp and noted that the rash on her leg was consistent with a tick bite. Gravell and Rattner included tick-borne illness in their differential diagnoses lists, and defendants acknowledged that the additional symptoms with which decedent presented during the second visit were consistent with a tick-borne illness. Further, Rattner was also aware that decedent had been treating with Bactrim for several days and saw very little, if any, improvement in her rash. According plaintiffs, as the nonmoving parties, the benefit of all reasonable inferences,[FN2] plaintiffs raised a question of fact regarding whether defendants deviated from the standard of care by failing to immediately administer doxycycline to decedent following the first visit to the urgent care, as she presented with a distinctive rash and history of spending significant time outdoors in an endemic tick zone. This question of fact is supported by the second visit, when decedent presented with additional symptoms that defendants acknowledge were consistent with a tick-borne illness. We also find that material questions of fact exist regarding causation, as plaintiffs provided sufficient details to allow a rational juror to conclude that decedent would have had a better chance at recovering from her illness if she had received doxycycline upon her first or second visit to the urgent care (see Sovocool v Cortland Regional Med. Ctr., 218 AD3d at 952; D.Y. v Catskill Regional Med. Ctr., 156 AD3d at 1005). As plaintiffs raised triable questions of fact in opposition to defendants' motion for summary judgment, Supreme Court erred in granting such motion and dismissing the complaint (see Sovocool v Cortland Regional Med. Ctr., 218 AD3d at 953; Leberman v Glick, 207 AD3d 1203, 1206 [4th Dept 2022]). Consequently, the order on appeal must be reversed and the matter remitted to Supreme Court for further proceedings.
Egan Jr., J.P., Reynolds Fitzgerald, McShan [*6]and Powers, JJ., concur.
ORDERED that the order is reversed, on the law, with costs, and motion denied.

Footnotes

Footnote 1: The complaint originally contained claims relating to a physician, medical facilities and medical groups who treated decedent in the days following her initial visits to the urgent care; however, such claims were discontinued by voluntary stipulation.

Footnote 2: It appears that Supreme Court made improper credibility determinations when it found plaintiffs' experts' opinions as to the likelihood of decedent having had a tick-borne illness too speculative but made no such finding regarding defendants' expert's opinion that decedent's symptoms could have been attributed to a tick-borne illness but also could have been attributed to "any number of medical conditions" without further specification.