Scott v Santiago (2024 NY Slip Op 04289)

Scott v Santiago

2024 NY Slip Op 04289

Decided on August 22, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:August 22, 2024

CV-23-0379
[*1]Ashley H. Scott et al., Appellants,
v
Crystal M. Santiago et al., Respondents, et al., Defendant.

Calendar Date:May 29, 2024

Before:Aarons, J.P., Pritzker, Lynch, Ceresia and Mackey, JJ.

LaFave, Wein & Frament, PLLC, Albany (Amina Karic of counsel), for appellants.
Monaco Cooper Lamme & Carr, PLLC, Albany (Mackenzie E. Kesterke of counsel), for Crystal M. Santiago and others, respondents.
Thorn Gershon Tymann and Bonanni, LLP, Albany (Marshall Broad of counsel), for Jonathan D. Mishkin, respondent.
Schwab & Gasparini, PLLC, Syracuse (Andrew J. Schwab of counsel), for St. Peter's Health Partners and others, respondents.

Aarons, J.P.
Appeal from an order of the Supreme Court (Christina L. Ryba, J.), entered January 17, 2023 in Albany County, which granted certain defendants' motions for summary judgment dismissing the complaint against them.
After a positive home pregnancy test, plaintiff Ashley H. Scott presented at defendant Capital Region Women's Care, a practice of defendant Community Care Physicians, P.C. (hereinafter collectively referred to as CCP), on December 14, 2016 experiencing pain in her lower left abdomen. Defendant Crystal M. Santiago, an obstetrician/gynecologist (hereinafter OBGYN) practicing at CCP, confirmed Scott's positive pregnancy results, examined her abdomen and performed an ultrasound. The ultrasound revealed an enlarged left fallopian tube and fluid in the pelvis, but Santiago did not observe any visible sign of an intrauterine pregnancy (hereinafter IUP). Santiago informed Scott that she suspected a potentially life-threatening ruptured ectopic pregnancy and recommended an immediate laparoscopy and dilation and curettage (hereinafter D & C). Santiago performed those procedures the same day at defendant Samaritan Hospital, after which she informed Scott that no ectopic pregnancy was visualized and her left fallopian tube appeared normal, but recommended methotrexate to end any unobserved potential pregnancy. Scott declined.
Scott returned to CCP on December 16, 2016 for a follow-up appointment, where she was examined by defendant Elizabeth Elsagga, another OBGYN practicing at CCP. Elsagga reviewed bloodwork indicating Scott was still pregnant. The next day, on Elsagga's advice, Scott presented at the emergency department of defendant St. Peter's Hospital, where another ultrasound was performed. Defendant Jonathan Mishkin, a radiologist employed by defendant St. Peter's Health Partners Medical Associates,[FN1] reviewed the ultrasound images and determined there was no intrauterine gestational sac but could not exclude the possibility of an ectopic pregnancy near Scott's left ovary. Melissa Fiorini, the emergency department attending physician at St. Peter's Hospital, concurred with Mishkin. Scott then met with Elsagga again, who assured Scott there was nothing in her uterus and recommended methotrexate, which was administered.
Bloodwork again revealed that Scott may still be pregnant, and, on Elsagga's advice, Scott returned to St. Peter's Hospital on December 21, 2016, where new ultrasound images taken on that date and interpreted by a different radiologist revealed an IUP determined to be a "[s]ingle, viable intrauterine gestation." The radiologist estimated the embryo's gestational age at 5 weeks, 5 days based upon the crown rump length but discerned no detectible heartbeat, possibly due to "small size."
Scott was discharged with a diagnosis of a threatened miscarriage and returned to CCP, where Santiago advised her that the methotrexate administered on December 17, 2016 increased the probability of birth defects and that she could terminate the IUP[*2]. Scott opted to continue the IUP and switched care providers. On January 5, 2017, the embryo's gestational age was estimated to be 6 weeks, 1 day based upon crown rump length, but Scott was informed that the IUP was not viable, and the IUP was terminated on that date.
Scott and her spouse, derivatively, commenced this medical malpractice action in January 2019, against Santiago, Elsagga, Mishkin, Fiorini and, vicariously, their employers and the medical facilities where Scott received treatment.[FN2] Plaintiffs allege that defendants misdiagnosed and unnecessarily treated Scott for an ectopic pregnancy with surgery and methotrexate, which rendered Scott's IUP nonviable, and failed to inform Scott that she could have a viable IUP. Defendants each joined issue, and, following discovery, filed three motions for summary judgment dismissing the complaint against them. Over plaintiffs' opposition, Supreme Court granted defendants' motions, and this appeal ensued.
To prevail on their motions for summary judgment on the medical malpractice claims against them, defendants bore the initial burden of demonstrating that they did not deviate from accepted medical practice or that any such deviation was not a proximate cause of the claimed injuries (see Sovocool v Cortland Regional Med. Ctr., 218 AD3d 947, 949 [3d Dept 2023]; Busch v Sherman, 209 AD3d 1230, 1231 [3d Dept 2022]). "If a prima facie case is established, the burden then shifts to plaintiffs to come forward with proof demonstrating [defendants'] deviation from accepted medical practice and that such alleged deviation was the proximate cause of [plaintiffs'] injuries" (Schrader v Nichols, 198 AD3d 1153, 1154 [3d Dept 2021] [internal quotation marks and citations omitted]; see Fischella v Saint Luke's Cornwall Hosp., 204 AD3d 1343, 1344 [3d Dept 2022]).
To support their motion, Santiago, Elsagga and CCP (hereinafter collectively referred to as the CCP defendants) submitted the affidavit of Nancy Kirshenbaum, a board-certified OBGYN licensed in this state. Kirshenbaum opined that Scott's symptoms and medical history and the lack of any visible sign of an IUP justified Santiago's suspicion that Scott was experiencing an ectopic pregnancy, and the immediate exploratory laparoscopy and D & C procedure were within the standard of accepted practice. Kirshenbaum also affirmed that Elsagga's treatment was similarly within accepted standards of care in light of the absence of a visible IUP on the ultrasound images and bloodwork indicating that, even after the D & C procedure, Scott still harbored a pregnancy of unknown location. The burden thus shifted to plaintiffs "to provide competent expert medical opinion evidence raising genuine issues of material fact as to deviation and causation" (Young v Sethi, 188 AD3d 1339, 1341 [3d Dept 2020] [internal quotation marks and citation omitted], lv denied 37 NY3d 902 [2021]; see Furman v DeSimone, 180 AD3d 1310, 1311 [3d Dept 2020]).
With respect to the CCP defendants, plaintiffs [*3]submitted the expert affidavit of Richard Louis Luciani, a board-certified OBGYN licensed in New Jersey. As to Santiago's treatment, Luciani's affidavit raises a question of fact as to whether the performance of the D & C before the laparoscopy deviated from the standard of care.[FN3] The laparoscopy is described in the record as "diagnostic" or "exploratory," which corresponds with Santiago's diagnosis of a potential or possible ruptured ectopic pregnancy. Further, Santiago testified that she conducted the D & C first because it was her habit, and that the uterine manipulator required for the laparoscopy could be placed without conducting the D & C. These portions of the record support Luciani's assertion that Santiago deviated from the standard of care because there was "no sound medical reason" to perform the D & C "prior to operating on the left fallopian tube and ovary, where she suspected the ectopic pregnancy was" (see Fischella v Saint Luke's Cornwall Hosp., 204 AD3d at 1344).
Luciani further opined that Elsagga and Santiago deviated from the standard of care when they did not "follow the [beta human chorionic gonadotropin (hereinafter BHCG)] levels and monitor [Scott] and do repeat imaging studies" when the laparoscopy did not locate an ectopic pregnancy. The record shows that defendants reviewed Scott's levels of BHCG on December 16 and 17, 2016 and ordered a new ultrasound on December 17 before Elsagga recommended the administration of methotrexate. Thus, Luciani's opinion in this respect is unsupported by the record and therefore insufficient to raise an issue of fact to defeat the CCP defendants' motion for summary judgment on this alleged deviation from the standard of care (see Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002]; Fiszer v Gliwa, 223 AD3d 881, 882 [2d Dept 2024]).
Luciani does, however, carry plaintiffs' shifted burden with respect to Elsagga's diagnosis of an ectopic pregnancy and methotrexate treatment. According to Luciani, Elsagga breached the standard of care by concluding that Scott may have an ectopic pregnancy given that she was "asymptomatic" for that condition when Elsagga saw her, leading to the administration of methotrexate. In our view, this creates an issue of fact with respect to a breach of the standard of care and causation (see Xiao Yan Chen v Maimonides Med. Ctr., 104 AD3d 680, 681 [2d Dept 2013]; cf. Lesniak v Stockholm Obstetrics & Gynecological Servs., P.C., 132 AD3d 959, 961 [2d Dept 2015]).
With respect to the claims against Mishkin, Ronald Karo, a board-certified radiologist practicing in this state, opined that the December 17, 2016 ultrasound images were sufficiently clear to permit Mishkin to conclude that there was no intrauterine gestational sac present and an ectopic pregnancy could not be excluded. Defendant St. Peter's Health Partners, defendant Northeast Health, St. Peter's Health Partners Medical Associates, Samaritan Hospital and St. Peter's Hospital (hereinafter collectively referred [*4]to as the St. Peter's defendants) submitted the affidavit of Lisa Loring, a board-certified radiologist licensed to practice in Massachusetts. Loring also reviewed the December 17 ultrasound images and, like Karo, asserted that those images are of "good quality." Loring also opined, based on a reasonable degree of medical certainty, that there is no intrauterine gestational sac in those images, and that "Mishkin correctly interpreted and reported the findings as evidenced on the imaging." In light of this evidence, "the burden shifted to plaintiff[s] to present expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of [Scott's] injury"(Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1080 [3d Dept 2023] [internal quotation marks and citation omitted]).
Plaintiffs submitted the affirmation of Peter Michael Doubilet, a board-certified radiologist licensed in Massachusetts. Doubilet opined that Mishkin deviated from the standard of care in failing to properly interpret the December 17, 2016 ultrasound by reporting that Scott's uterine fundus was "not clearly visualized" and failing to make the proper recommendation for a follow-up ultrasound.[FN4] Specifically, Doubilet asserted that, on ultrasound images taken December 17, 2016 "between time 03:29:35 and 03:31:17, the uterine fundus . . . appears blurry," further observing that "the image at 3:30:17 suggests the presence of a gestational sac in the uterine fundus." As such, Doubilet stated that "the correct interpretation of this ultrasound is that the uterine fundus is not clearly visualized and that there is a possible gestational sac in that part of the uterus," explaining that "[t]he correct recommendation [wa]s to do a follow-up ultrasound in 3-4 days to re-assess for an [IUP]." Furthermore, according plaintiffs the benefit of all reasonable inferences, the alleged appearance of a nearly six-week-old IUP on the December 21 ultrasound images raises an issue of fact as to whether Mishkin's alleged failure to detect an IUP on December 17 was a cause of Scott's injuries. The competing expert opinions as to whether the December 17 images were adequate to assess the presence of an IUP, and, by extension, whether a gestational sac was actually visible on one of the images, presents a material question of credibility and fact for a jury to resolve (see Lubrano-Birken v Ellis Hosp., ___ AD3d ___, ___, 2024 NY Slip Op 03573, *5 [3d Dept 2024]; Fiszer v Gliwa, 223 AD3d at 883; Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1083-1084).
Because plaintiffs' action against Mishkin is reinstated, we must also reinstate so much of plaintiffs' complaint as alleged the vicarious liability of Mishkin's employer, St. Peter's Health Partners Medical Associates (see Webb v United Health Servs., Inc., 221 AD3d 1315, 1318 [3d Dept 2023]).[FN5] Furthermore, the December 17, 2016 ultrasound images Mishkin is alleged to have [*5]misinterpreted were taken at St. Peter's Hospital, which Scott entered through its emergency department. Given this record, the St. Peter's defendants have "failed to make out a prima facie case that [Scott] could not have reasonably believed that [she] was receiving medical care from the hospital in general rather than from a particular physician" (Friedland v Vassar Bros. Med. Ctr., 119 AD3d 1183, 1186 [3d Dept 2014] [internal quotation marks and citation omitted]; see St. Andrews v Scalia, 51 AD3d 1260, 1262 [3d Dept 2008]).
Turning to the informed consent cause of action against the CCP defendants, Kirshenbaum did not opine that the risks and alternatives discussed with Scott prior to the surgical intervention by Santiago and the administration of methotrexate ordered by Elsagga were ones that a "reasonable practitioner would have disclosed" (Rivera v Albany Med. Ctr. Hosp., 119 AD3d 1135, 1138 [3d Dept 2014] [internal quotation marks and citation omitted]; see Cole v Chun, 185 AD3d 1183, 1185 [3d Dept 2020]). More specifically, plaintiffs' claim, as we understand it, is that a reasonable practitioner in the CCP defendants' position would have disclosed to Scott that, although she presented with symptoms suggesting an ectopic pregnancy, she might also have had a viable IUP that was just too small to detect. Kirshenbaum's affidavit does not address this claim, nor does she opine on whether a reasonable person in plaintiff's position so informed would have still elected to undergo the D & C, methotrexate treatment or both if the risk of harming or terminating a viable but invisible IUP had been discussed (see Henderson v Takemoto, 223 AD3d 996, 1002 [3d Dept 2024]). Further, Fiorini's notes from December 17, 2016 reflect that Elsagga explained to Scott that she "definitely" had an ectopic pregnancy and not an IUP, even though after the laparoscopy Scott's pregnancy was diagnosed as being in an unknown location.[FN6] Thus, the burden never shifted to plaintiffs on this issue, and this part of the CCP defendants' motion should have been denied without regard for the sufficiency of plaintiffs' proof (see id.; Cole v Chun, 185 AD3d at 1186).
Plaintiffs' remaining arguments, to the extent not addressed above, have been considered and are unavailing.
Pritzker, Lynch, Ceresia and Mackey, JJ., concur.
ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as granted (1) the motion by defendant Jonathan Mishkin, (2) the motion by defendants Capital Region Women's Care, Community Care Physicians, P.C., Crystal M. Santiago and Elizabeth Elsagga on the cause of action for medical malpractice with respect to Santiago's performance of the dilation and curettage and Elsagga's diagnosis of ectopic pregnancy and recommendation to administer methotrexate, and on the cause of action for lack of informed consent and (3) the motion by defendants St. Peter's Health Partners, Samaritan Hospital, Northeast Health, St. Peter's Hospital[*6], and St. Peter's Health Partners Medical Associates with respect to their vicarious liability; motions denied to that extent; and, as so modified, affirmed.

Footnotes

Footnote 1: Supreme Court stated that Mishkin was an employee of defendant Samaritan Hospital.

Footnote 2: Plaintiffs have discontinued their action against Fiorini.

Footnote 3: We agree with plaintiffs that it was improper for Supreme Court to weigh the education, training and experience of plaintiffs' out-of-state experts as they are all board certified in the defendants' areas of practice, and there is no cause to believe their opinions are unreliable. "It is sufficient if the expert attests to familiarity with either the standard of care in the locality or to a minimum standard applicable locally, statewide, or nationally" (M.C. v Huntington Hosp., 175 AD3d 578, 580-581 [2d Dept 2019] [citations omitted]; see Gruen v Brathwaite, 215 AD3d 927, 929 [2d Dept 2023]).

Footnote 4: Supreme Court observed that Doubilet's opinion was internally inconsistent insofar as he claimed to see the suggestion of a gestational sac despite opining that the image was blurry. Such dissonance goes to the credibility of Doubilet's opinion, which is not an appropriate consideration on summary judgment (see Fischella v St. Luke's Cornwall Hosp., 204 AD3d at 1345).

Footnote 5: Plaintiffs do not dispute that Mishkin was not an employee of Samaritan Hospital, nor do they argue that Samaritan Hospital is vicariously liable for any of the individual defendants' alleged malpractice.

Footnote 6: Elsagga in her testimony disputed Fiorini's characterization of her discussion with Scott.