Liquori v Dolkart (2022 NY Slip Op 02314)

Liquori v Dolkart

2022 NY Slip Op 02314

Decided on April 7, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 7, 2022

525919
[*1]Bridgette Liquori, Individually and as Parent and Guardian of J.U., an Infant, Respondent,
v
Lawrence Dolkart et al., Appellants, et al., Defendant.

Calendar Date:February 15, 2022

Before:Garry, P.J., Lynch, Clark and Reynolds Fitzgerald, JJ.

Levene Gouldin & Thompson, LLP, Vestal (Jenilyn M. Brhel of counsel), for Lawrence Dolkart, appellant.
Heidell, Pittoni, Murphy & Bach, LLP, New York City (Daniel S. Ratner of counsel), for Tammy Marie Brant and another, appellants.
Kenneth J. Ready & Associates, Mineola (Gregory S. Gennarelli of counsel), for respondent.

Lynch, J.
Appeal from an order of the Supreme Court (O'Shea, J.), entered March 21, 2017 in Chemung County, which, among other things, denied motions by defendants Lawrence Dolkart, Tammy Brant and Birth N. Beyond, LLP for summary judgment dismissing the complaint against them.
In February 2012, plaintiff went into preterm labor at 32 weeks gestation and gave birth to J.U. (hereinafter the infant), who suffered a brain bleed and developed, among other things, cerebral palsy. During the course of the pregnancy, plaintiff received prenatal care from defendant Birth N. Beyond, LLP (hereinafter BNB), a midwifery practice. Defendant Tammy Brant, a certified nurse midwife, was a minority partner of BNB and defendant Lawrence Dolkart — a collaborating physician — was the majority partner, with an interest of around 80%. In January 2012, Dolkart performed a level two ultrasound to assess the infant's kidneys, ultimately finding that they were normal. Dolkart also assisted with the infant's delivery the next month.
Plaintiff commenced this action alleging medical malpractice by BNB, Brant and Dolkart (hereinafter collectively referred to as defendants), among others. As relevant here, plaintiff asserted that, given her medical history — which included four prior preterm deliveries — defendants departed from the accepted standard of medical care by failing to offer her progesterone treatment to prevent the risk of preterm labor during the subject pregnancy. She further alleged that the failure to do so was a proximate cause of the infant's injuries. Following joinder of issue and discovery, defendants separately moved for summary judgment dismissing the complaint against them. Supreme Court denied defendants' motions, finding that there were triable issues of fact.[FN1] Defendants appeal.
Initially, during oral argument before this Court, plaintiff conceded that she did not oppose Brant's motion for summary judgment and that the claims against Brant should be dismissed. The record reveals that plaintiff also did not oppose the portions of BNB's and Dolkart's motions seeking dismissal of the claims against them premised upon different theories of malpractice not related to the failure to provide progesterone. Accordingly, those claims of malpractice must also be dismissed (see Burns v Kroening, 164 AD3d 1640, 1641 [2018]; Genovese v Gambino, 309 AD2d 832, 833 [2003]; Mortka v K-Mart Corp., 222 AD2d 804, 804 [1995]).
As for the claim against Dolkart related to the failure to provide progesterone, he argues that he did not owe plaintiff a duty of care in this respect because no patient-physician relationship existed between them and he did not exercise supervisory control over the care provided by BNB so as to be held vicariously liable for any malpractice on its part. He further posits that, even if he did owe a duty of care to plaintiff, he did not deviate from good and accepted medical practice because, at the time of plaintiff's pregnancy, providing [*2]progesterone was not the standard of care in preventing preterm delivery for women with plaintiff's history.
To establish her claim of medical malpractice against Dolkart and BNB, plaintiff bears the burden of demonstrating that they owed her a duty of care, deviated from the accepted standard of care and such deviation was a proximate cause of the infant's injuries (see Marshall v Rosenberg, 196 AD3d 817, 818 [2021]; Burtman v Brown, 97 AD3d 156, 161 [2012]). "'Generally, a doctor only owes a duty of care to his or her patient'" (Marshall v Rosenberg, 196 AD3d at 818-819, quoting McNulty v City of New York, 100 NY2d 227, 232 [2003]), and "that duty may be limited to those medical functions undertaken by the physician and relied upon by the patient" (Romanelli v Jones, 179 AD3d 851, 852 [2020]).
"'[A] physician-patient relationship is created when professional services are rendered and accepted for purposes of medical or surgical treatment'" (Marshall v Rosenberg, 196 AD3d at 818, quoting Thomas v Hermoso, 110 AD3d 984, 985 [2013]). Where no direct patient-physician relationship exists, "'an implied physician-relationship can arise when a physician gives advice to a patient, even if the advice is communicated through another health care professional'" (Marshall v Rosenberg, 196 AD3d at 818 [brackets omitted], quoting Thomas v Hermoso, 110 AD3d at 985). Whether a medical professional owed a duty of care to the plaintiff "is [generally] a legal question for courts to determine" (Marshall v Rosenberg, 196 AD3d at 818). However, "'[w]hether a physician's proffer of advice furnishes a sufficient basis upon which to conclude that an implied physician-patient relationship has arisen is ordinarily a question of fact for a jury'" (Marshall v Rosenberg, 196 AD3d at 819, quoting Thomas v Hermoso, 110 AD3d at 985). Moreover, a physician may be held vicariously liable for the negligent acts of "those they 'exercise some general authority or control over'" (Ruggiero v Miles, 125 AD3d 1216, 1217 [2015], quoting Kavanaugh v Nussbaum, 71 NY2d 535, 546 [1988]).
In support of their motions for summary judgment, defendants submitted, among other things, transcripts of the parties' depositions, plaintiff's medical records and affirmations from various medical professionals. During her deposition, plaintiff revealed that she had four prior preterm deliveries before the subject pregnancy. Two of those babies were born at "about eight months," one was born at roughly "[7½] months" and one was "[a]lmost full term." Plaintiff testified that she saw Dolkart for "the last four of [her] pregnancies" — including during the subject pregnancy — and chose BNB to provide prenatal care because she "knew [she] was going to get the specialist," emphasizing that she "felt that [Dolkart] knew what he was doing with preterm labor."
As for her interactions with Dolkart, plaintiff testified that, in addition to performing ultrasounds during her pregnancies, he met with her[*3]"for consults with every pregnancy" for which she was referred to him.[FN2] During these consults, plaintiff "[w]ent into his office" and they "went over [her] medical history with [her] prior pregnancies." She also recalled discussions with BNB personnel during which it was made clear that Dolkart "was the overseeing doctor and . . . the person they go to if there is something that they need . . . and they have to consult a doctor." To that end, the record demonstrates that, in addition to assisting with the birth of the infant and performing a level two ultrasound in January 2012, Dolkart also signed off on three prior ultrasound reports from BNB regarding the subject pregnancy in September 2011, October 2011 and November 2011.
Dolkart, in turn, testified during his deposition that, as a maternal fetal medicine specialist, he is involved in the treatment of high risk pregnancies and only provides care for patients of BNB when they are specifically referred to him in that regard. He maintained that, upon being referred a high risk pregnancy patient, BNB would continue to provide care to the patient and he would provide consultation to BNB. Dolkart testified that a referred individual would only become his patient if the problem for which the referral was made needed to be "exclusively cared for" by a specialist. He acknowledged that it "could be" appropriate for a patient with a history of preterm deliveries to be referred to him — depending on the particular circumstances — because women with such histories are at a higher risk for subsequent preterm deliveries. Dolkart confirmed that he first had contact with plaintiff in 2005 during her second pregnancy after she was referred to him by BNB. He further acknowledged that every one of her children was a preterm child, making her more susceptible in 2012 to another preterm delivery. Indeed, the record contains a letter from Dolkart to a referring midwife in September 2009 — during a prior pregnancy — in which he noted that, because plaintiff's prior child was delivered at approximately 35 weeks gestation, plaintiff "has a small increased risk for preterm delivery again."
Although Dolkart maintained that he only met with plaintiff once during the subject pregnancy when he performed the ultrasound in January 2012, he noted that, when BNB refers a patient to him, it is his practice to examine the patient and discuss the clinical situation with her. Dolkart was adamant that it was not the standard of care in 2011 and 2012 to offer progesterone therapy to a woman with plaintiff's history insofar as her prior deliveries involved births after 35 weeks gestation. In that regard, he revealed that "[a]round 2012 and perhaps towards the end of 2011," he provided instructions to BNB midwives about the use of progesterone for patients who had previously delivered a baby before 35 weeks gestation, explaining that the research at that time indicated that progesterone supplementation might be beneficial [*4]in helping to prevent a subsequent preterm delivery for such women. He noted, however, that more research on the benefits of progesterone had since come out, making it likely that he would have recommended it to plaintiff had she seen him in 2015.
Erin Spring, a nurse midwife with BNB at the time of the subject pregnancy, testified during her deposition that she considered Dolkart to be her supervisor in 2011 and into the early part of 2012 when she sought him out for collaboration. Spring confirmed that, if a woman presented to BNB as high risk, she would be transferred to Dolkart and care would be co-managed between Dolkart and BNB. Brant also gave testimony to this effect, noting that, although midwives at BNB are independent practitioners, women with an elevated pregnancy risk — including women with a history of preterm labor and delivery, depending on the severity of the prematurity — would be referred to Dolkart, and BNB would rely upon the instructions of Dolkart for the patient's course of care and treatment. Brant confirmed that Dolkart would have been consulted regarding the subject pregnancy shortly after plaintiff's first visit to BNB in light of her prior history.
In further support of his motion for summary judgment, Dolkart submitted a sworn affirmation from Mary E. D'Alton, a board-certified physician of obstetrics and gynecology with a sub-specialty in maternal fetal medicine. D'Alton averred that Dolkart's involvement in plaintiff's care "does not mean that he assumed the care of [plaintiff] prenatally." Although D'Alton noted that Dolkart was generally available to the midwives for consultation, collaboration and referral, his treatment in this case was limited to performing one level 2 ultrasound, reviewing the reports of ultrasounds performed by BNB and handling the delivery of the infant on February 24, 2012. She ultimately opined that Dolkart "provided . . . plaintiff . . . with good and acceptable medical care . . . and that the care and treatment provided by [him] was not a substantial cause of harm to . . . plaintiff."
By contrast, plaintiff's expert physician, a doctor of gynecology and obstetrics, opined that, as the owner of BNB and "the collaborating and supervising physician of the midwife practice and its employees," Dolkart "was responsible for setting the policies and practice guidelines for patient care at [BNB]." The expert further averred that, as part of such duty, Dolkart was responsible for "supervising his employees to make sure that those policies were followed and that his employees practiced within the applicable standards of care," and that Dolkart and the BNB midwives each had the same duty of care to offer and provide plaintiff with progesterone at the time of the subject pregnancy due to her prior history of preterm labor.
Although we are mindful that the element of duty is generally a legal question for the courts to resolve (see Marshall v Rosenberg, 196 AD3d at 819), whether Dolkart [*5]owed a duty of care to plaintiff as it pertained to progesterone treatment cannot be determined as a matter of law on this record. Dolkart is correct that the referral of a patient for the sole purpose of having a level 2 ultrasound does not necessarily give rise to a general duty of care beyond the limited medical functions for which the patient was referred (see Dombroski v Samaritan Hosp., 47 AD3d 80, 84 [2007]). Here, however, Dolkart's care of plaintiff went beyond a single isolated ultrasound. As a collaborating physician, BNB referred high risk patients to Dolkart for collaborative care. However, the record contains conflicting proof as to whether plaintiff would have been considered a high risk patient at the time that she sought care with BNB for the subject pregnancy. To that end, the record includes an affidavit from Barbara W. Graves — a certified nurse midwife — who averred that, at the time of the subject pregnancy, a woman with plaintiff's history of preterm delivery, all involving births after 35 weeks gestation, would not necessarily have been considered at higher risk for preterm labor in a subsequent pregnancy.
Brant, in contrast, indicated that, based upon plaintiff's history of preterm deliveries, Dolkart would have been consulted regarding plaintiff's case shortly after her first appointment, and it is clear that Dolkart considered plaintiff to be at higher risk for preterm delivery based upon her medical history. There was also testimony that Dolkart set BNB's policies and practices as it related to progesterone treatment in 2011 and 2012. Given such conflicting proof, questions of fact exist as to whether plaintiff was a high risk patient, whether Dolkart owed a duty of care to her on that basis in accordance with his status as BNB's collaborative physician and, if so, whether the scope of that duty encompassed care tailored to prevent preterm delivery.
There are also questions of fact as to whether Dolkart owed a duty of care to plaintiff — independent of her risk status — based upon his interactions with her during the subject pregnancy. In addition to performing an ultrasound on plaintiff in January 2012, Dolkart was familiar with her history of preterm deliveries, having been involved in her care in prior pregnancies, and reviewed and signed off on her ultrasound reports from BNB regarding the subject pregnancy (see Romanelli v Jones, 179 AD3d at 855). According to plaintiff, Dolkart also met with her directly to go over her history and, although she did not specify when this meeting occurred, Brant confirmed that a consult would have occurred early on. In these circumstances, there are questions of fact as to whether an implied physician-patient relationship existed between Dolkart and plaintiff during the course of the subject pregnancy as it pertained to her prenatal care (see Marshall v Rosen, 196 AD3d at 823-824; Thomas v Hermoso, 110 AD3d at 986; Forrester v Zwanger-Pesiri Radiology Group, 274 AD2d 374[*6], 375 [2000]).
Even independent of any physician-patient relationship that may have arisen between Dolkart and plaintiff, questions of fact exist as to whether Dolkart may be held vicariously liable for any negligence on the part of BNB in the course of plaintiff's care. Under Education Law § 6951 (1), midwives are authorized to manage "normal" pregnancies while maintaining collaborative relationships with licensed physicians. Dolkart, as the majority partner of BNB, acted as the collaborating physician for the midwifery practice in accordance with this statutory requirement, and the testimony indicates that he set BNB's policies with respect to the use of progesterone. Although Brant testified that the midwives of BNB were "independent practitioners," plaintiff's expert averred that, as the "collaborating and supervising physician of the midwife practice and its employees, [Dolkart] was responsible for setting the policies and practice guidelines for patient care at [BNB], as well as for supervising his employees to make sure that those policies were followed and that his employees practiced within the applicable standards of care." As such, there are questions of fact as to whether Dolkart may be held vicariously liable for any negligence on the part of BNB in failing to refer plaintiff to him for care as a high risk patient, regardless of any physician-patient relationship that may have existed between them (see generally Kavanaugh v Nussbaum, 71 NY2d at 546; Ruggiero v Miles, 125 AD3d at 1218; compare Wahila v Kerr, 204 AD2d 935, 937 [1994]).
That leaves the question of whether the failure to offer plaintiff progesterone was, in fact, a departure from the accepted standard of care and, if so, whether such departure was a proximate cause of the infant's injuries. In support of its motion for summary judgment, BNB submitted, among other things, an affirmation from Peter S. Bernstein, a board-certified physician of obstetrics and gynecology. Bernstein opined, to a reasonable degree of medical certainty, that "[p]rogesterone for the prevention of preterm labor and delivery was not required by the standard of care at the time of [plaintiff's] 2011 pregnancy, especially with her obstetrical history," and the infant's preterm delivery "was not caused by negligence on the part of any of the defendants." Dolkart also testified to this effect.
In contrast, plaintiff's medical expert opined that the failure to offer and provide intramuscular progesterone injections to plaintiff between 16 and 20 weeks gestation "was a departure from good and accepted medical practice" at the time of the subject pregnancy — citing studies dating back to 2003 on the benefits of progesterone in mitigating the risk of preterm labor — and that such departure was "a substantial factor in the pre[]term birth and related injuries sustained by the infant." Such conflicting medical proof plainly establishes triable issues of fact on the elements of breach and causation[*7], rendering summary judgment to Dolkart inappropriate (see Marshall v Rosenberg, 196 AD3d at 822; Kovacic v Griffin, 170 AD3d 1143, 1144-1145 [2019]).
With respect to BNB's motion, it maintains that it cannot be held liable for any negligence in failing to provide plaintiff with progesterone because Dolkart, as the collaborating physician, was the individual who "set the policies, instructions, and guidance for BNB's employees, including whether to administer or offer progesterone to patients," and BNB's midwives were permitted to rely on Dolkart's instructions in that respect. BNB further argues that its failure to refer plaintiff to Dolkart for progesterone therapy was not a proximate cause of the infant's injuries because Dolkart testified that he would not have prescribed progesterone to plaintiff even if she had been referred to him for that purpose.
Bernstein opined in his affirmation that the "BNB midwives were entitled to rely on . . . Dolkart's treatment policies, directives and decisions when it came to management of patients at BNB" and that it was "appropriate and within the standard of care for BNB to defer to . . . Dolkart and follow his general policy determinations" — an opinion with which Graves agreed. However, plaintiff's medical expert averred that "[t]he midwives and [BNB] had the same duty of care to [plaintiff] as . . . Dolkart [did] with respect to progesterone therapy" and that BNB and Dolkart both "departed from good and accepted practice by failing to recommend, offer or use progesterone during [plaintiff's] pregnancy with the infant."[FN3]
Although such conflicting proof would usually be sufficient to create a triable issue of fact, the opinion of plaintiff's expert that BNB's midwives owed an independent duty of care to plaintiff with respect to progesterone does not comport with Education Law § 6951 (1), which defines "[t]he practice of the profession of midwifery . . . as the management of normal pregnancies." Correspondingly, a midwife's authority to prescribe and administer medication is limited to the "practice of midwifery" (Education Law § 6951 [2]). Thus, to the extent that plaintiff's pregnancy was high risk, Dolkart, rather than the midwives at BNB, would have had the authority and responsibility for directing her course of treatment.
That said, BNB and Dolkart are integrally intertwined, and BNB may be liable for any injuries incurred by the infant as a result of "any wrongful act or omission" on Dolkart's part deriving from "the ordinary course of the business of the partnership" (Partnership Law § 24). Given Dolkart's status as the majority partner of BNB and the evidence that he was responsible for setting its policies and practices, including with respect to progesterone, we agree with Supreme Court that questions of fact exist as to BNB's liability, precluding judgment as a matter of law in its favor.
Garry, P.J., Clark and Reynolds Fitzgerald, JJ., concur.
ORDERED that the order is modified[*8], on the law, without costs, by reversing so much thereof as (1) denied defendant Tammy Brant's motion for summary judgment dismissing the complaint against her and (2) denied so much of the motions for summary judgment by defendants Birth N. Beyond, LLP and Lawrence Dolkart seeking dismissal of the claims of malpractice not premised upon the failure to provide progesterone; motions granted to said extent; and, as so modified, affirmed.

Footnotes

Footnote 1: Supreme Court did, however, grant a motion for summary judgment dismissing the claims against defendant Arnot Ogden Medical Center, where the infant was delivered.

Footnote 2: The medical records reveal that, in addition to the subject pregnancy, Dolkart was involved in plaintiff's care in at least three of her prior pregnancies, though these pregnancies were not all managed by BNB.

Footnote 3: There was also testimony from Dolkart that the BNB midwives could write prescriptions and administer progesterone themselves.