Henderson v Takemoto (2024 NY Slip Op 00103)

Henderson v Takemoto

2024 NY Slip Op 00103

Decided on January 11, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 11, 2024

535997
[*1]Veronica Henderson, Respondent,
v
Richelle Takemoto et al., Appellants.

Calendar Date:November 14, 2023

Before:Egan Jr., J.P., Pritzker, Fisher, McShan and Powers, JJ.

O'Connor, O'Connor, Bresee & First, PC, Albany (Molly C. Casey of counsel), for appellants.
Cherundolo Law Firm PLLC, Syracuse (Peter C. Papayanakos of counsel), for respondent.

Egan Jr., J.P.
Appeals (1) from an order of the Supreme Court (John F. Lambert, J.), entered August 3, 2022 in Otsego County, which denied defendants' motion for summary judgment dismissing the complaint, and (2) from an order of said court, entered February 14, 2023 in Otsego County, which, upon reargument, partially adhered to its prior decision.
Plaintiff, a licensed practical nurse, was getting ready for work on the morning of January 31, 2018 and went outside to sweep a dusting of snow off the path leading to her front door. She slipped on ice while running on her lawn to get back into the house, fell and landed on her left wrist. Plaintiff suspected that she had broken something and, after her husband took her to the emergency room at defendant Mary Imogene Bassett Hospital (hereinafter the hospital), X-rays were taken and showed that she had indeed sustained a displaced fracture of her left distal radius.[FN1] An orthopedic surgeon, defendant Richelle Takemoto, performed a closed reduction of the wrist fracture with the assistance of a physician's assistant and applied a splint. The postreduction X-ray showed "mild displacement of the fracture fragments" that was "markedly improved" from the prereduction X-rays, and plaintiff was discharged with instructions to follow up with orthopedics in one week.
On February 5, 2018, plaintiff returned for an appointment with defendant Brinn M. Ostrander, a physician's assistant who ordered additional X-rays that revealed "maintained alignment." Ostrander directed plaintiff to return in a week, and the records of her February 14, 2018 visit indicate that X-rays showed "[m]aintained reduction" and that the splint was replaced with a cast. The notes of that visit also reflect that defendant Kristen Herbst, an orthopedic surgeon, "reviewed" the X-rays while sitting next to Ostrander. Plaintiff thereafter reported experiencing increasing achiness and numbness in her left hand and, beginning on March 16, 2018, she was treated over the course of several visits by defendant Michael R. Diaz, an orthopedic surgeon, for what was diagnosed as complex regional pain syndrome (hereinafter CRPS) of her left upper extremity.
Plaintiff commenced this action in July 2019, alleging that Takemoto, Ostrander, Diaz and Herbst (hereinafter collectively referred to as the individual defendants), both as individuals and in the course of their work for the hospital and/or defendant Bassett Healthcare Network, had committed medical malpractice and/or negligence and had failed to obtain plaintiff's informed consent for a medical procedure. Plaintiff focused in particular upon Takemoto's alleged failure on January 31, 2018 to obtain her informed consent for the closed reduction, Takemoto's failure to restore adequate alignment during that reduction, and the alleged failure of the other individual defendants to properly treat the fracture after the reduction, recognize that it was not properly aligned and recommend corrective action.[FN2]
Following joinder [*2]of issue and discovery, defendants moved in April 2022 for summary judgment dismissing the complaint. Defendants annexed to their motion papers the affirmations of Alexander E. Merkler and James M. Schneider — a neurologist and an orthopedic surgeon, respectively — who described how the fracture had been appropriately treated at all times and how plaintiff's ongoing complaints were related to CRPS, a "poorly understood" condition that sometimes arose in the aftermath of a traumatic injury and that Diaz appropriately treated with medication and physical therapy. Plaintiff, in response, provided an expert affirmation from an orthopedic surgeon who opined that the fracture was potentially unstable after being reduced by Takemoto and that the other individual defendants deviated from the proper standard of care by failing to take action when subsequent X-rays showed that the fracture had gone out of acceptable alignment. Plaintiff further provided the expert affirmation of a neurologist who opined, with the agreement of the orthopedic surgeon, that the individual defendants departed from the standard of care by failing to direct that plaintiff take vitamin C to reduce the risk of her developing CRPS. Supreme Court denied defendants' summary judgment motion in August 2022, and they promptly moved for reargument. In February 2023, Supreme Court issued an order in which it effectively granted reargument and, upon reargument, granted defendants' motion for summary judgment to the extent of dismissing the medical malpractice claim against Takemoto insofar as it related to the closed reduction performed on January 31, 2018 and the informed consent claim against Diaz, Herbst and Ostrander. Defendants appeal from the August 2022 and the February 2023 orders, arguing that they were entitled to summary judgment dismissing the complaint in its entirety.
We disagree and affirm. As the parties seeking summary judgment, defendants "bore the initial burden of presenting factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that they complied with the accepted standard of care or did not cause any injury to the patient" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1078 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see Young v Sethi, 188 AD3d 1339, 1340 [3d Dept 2020], lv denied 37 NY3d 902 [2021]). Defendants here came forward with plaintiff's medical records, the deposition testimony of the parties and others who had treated plaintiff, and the factually specific affirmations of Merkler and Schneider. Schneider described how his review of plaintiff's medical records had led him to conclude that plaintiff's fracture had been appropriately diagnosed, reduced and treated at all points, noting that the X-rays taken following the closed reduction showed adequate alignment of the fracture and that plaintiff's wrist thereafter remained and ultimately [*3]"healed in essentially the same position." Schneider added that Diaz appropriately prescribed medication and physical therapy when plaintiff developed symptoms consistent with CRPS, and Schneider opined that CRPS, which arose from the initial fall rather than any action or inaction on the part of the individual defendants, was the sole "cause of [plaintiff's] continued deformity, limitations, and pain complaints." Merkler, in turn, agreed from his review of plaintiff's medical records that she suffered from CRPS, and he opined that her development of CRPS was solely related to the initial trauma as opposed to any action or inaction by the individual defendants. Merkler added that Diaz had properly treated plaintiff once she exhibited symptoms of CRPS, and opined that CRPS was the cause of her ongoing physical problems.
There is no dispute that the foregoing satisfied defendants' initial burden and "shifted [the burden] to plaintiff to present expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of [her] injury" (Fischella v Saint Luke's Cornwall Hosp., 204 AD3d 1343, 1344 [3d Dept 2022]; see Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1080). Plaintiff, as noted above, attempted to meet that burden via the affirmations of an orthopedic surgeon and a neurologist. The orthopedic surgeon averred that his review of plaintiff's X-rays led him to conclude that the fracture was potentially unstable after Takemoto performed the closed reduction on January 31, 2018 and that the X-rays taken during plaintiff's initial follow-up visit with Ostrander on February 5, 2018 showed loss of acceptable alignment. As such, the orthopedic surgeon opined that Ostrander, Herbst and Diaz all deviated from the proper standard of care by failing to recognize the lack of acceptable alignment and correct the problem, as well as that the lack of alignment was a substantial factor in the degenerative changes and loss of function that plaintiff ultimately sustained in her wrist and hand. Plaintiff further provided the expert affirmation of a neurologist who observed that plaintiff was exhibiting symptoms of CRPS in the course of her follow-up appointments with the individual defendants and opined — with the support of plaintiff's expert orthopedic surgeon — that the individual defendants deviated from the proper standard of care in preventing the development of that condition. In particular, the neurologist cited 2009 clinical guidelines from the American Academy of Orthopedic Surgeons which recommended that a patient with a distal radius fracture take 500 mg of vitamin C every day for 50 days after the fracture to ward off the development of CRPS, as well as a 2014 literature review finding that the treatment had "practical merit" and his own clinical experience that patients were more likely to develop CRPS if they had not been given vitamin C after a wrist fracture. The neurologist [*4]pointed out that the records contained no indication that plaintiff was taking vitamin C prior to March 20, 2018, and opined that the failure of the individual defendants to prescribe vitamin C from January 31, 2018 onward "was a substantial factor in causing" the development of CRPS and "substantially [reduced plaintiff's] chances of a better outcome."
On their face, the affirmations of plaintiff's expert neurologist and expert orthopedic surgeon were not speculative or conclusory in that they "address[ed] specific assertions made by [defendants'] experts, set[ ] forth an explanation of the reasoning and rel[ied] on specifically cited evidence in the record" (Tsitrin v New York Community Hosp., 154 AD3d 994, 996 [2d Dept 2017] [internal quotation marks and citation omitted]; see Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1080). Indeed, the affirmations set forth detailed, factually specific opinions that the individual defendants all departed from the accepted standard of care by failing to prescribe vitamin C to plaintiff in a timely manner and that such was a proximate cause of her injuries relating to CRPS. Plaintiff's orthopedic surgeon similarly detailed in his affirmation the basis for the surgeon's opinion that Ostrander, Herbst and Diaz had failed to recognize and address the fact that plaintiff's fracture had gone out of acceptable alignment, leading to her continuing wrist and hand problems.[FN3] Defendants suggest that those affirmations failed to raise a material question of fact on those points despite the thorough explanation for both experts' opinions; we are unpersuaded.
First, defendants argue that plaintiff had not previously claimed that they played a role in the development of her CRPS and that she could not survive a summary judgment motion by advancing "a new or materially different theory of recovery against [them from the one] pleaded in the complaint and the bill of particulars" (Palka v Village of Ossining, 120 AD3d 641, 643 [2d Dept 2014]; see Fasce v Catskill Regional Med. Ctr., 209 AD3d 1138, 1140 [3d Dept 2022]; Bacalan v St. Vincents Catholic Med. Ctrs. of N.Y., 179 AD3d 989, 992 [2d Dept 2020]). The record reflects, however, that plaintiff alleged in her complaint and her bills of particulars that Takemoto, among others, had failed to warn her of the possibility of developing CRPS or explain how the wrist fracture should be treated over time, and she further alleged that all of the individual defendants committed malpractice by "fail[ing] to keep abreast of the relevant literature and follow such guidelines" in the field of orthopedic medicine as were accepted practice in treating a wrist fracture. It is that failure that plaintiff's experts pointed to — namely, the failure of the individual defendants to follow guidelines recommending that plaintiff be prescribed vitamin C following a wrist fracture — and that alleged malpractice therefore "necessarily flow[ed] from the information conveyed in the pleadings [*5]and" the bills of particulars (Boyer v Kamthan, 130 AD3d 1176, 1178 [3d Dept 2015]; compare Bacalan v St. Vincents Catholic Med. Ctrs. of N.Y., 179 AD3d at 992-993). In view of that connection, and noting defendants' apparent "aware[ness] of [a CRPS] basis" for plaintiff's malpractice claim given their argument that they were entitled to summary judgment on that claim because she had been properly treated for CRPS, plaintiff was free to provide expert proof on the issue in opposition to defendants' summary judgment motion (Boyer v Kamthan, 130 AD3d at 1178).
Second, defendants suggest that the opinion of plaintiff's orthopedic surgeon was conclusory regarding the alleged failure of Ostrander, Herbst and Diaz to properly treat the fracture because the surgeon's affirmation refers in passing to a "non-union" of the fracture in March 2018 when the record reflects that the fracture did, eventually, heal. A review of the affirmation leaves no doubt, however, that the orthopedic surgeon's point in that regard was that his review of the pertinent X-rays reflected that the fracture was "healing" out of proper alignment and that, as a result, Ostrander, Herbst and Diaz deviated from the standard of care by failing to perform another reduction to correct the lack of alignment in February or March 2018. We view no other deficiencies in the affirmations of plaintiff's expert neurologist and orthopedic surgeon and, accordingly, Supreme Court properly determined that they raised material questions of fact regarding the alleged malpractice of the individual defendants in failing to prescribe vitamin C, as well as the alleged malpractice of Ostrander, Herbst and Diaz in failing to take action when the fracture allegedly went out of acceptable alignment, that could not be resolved upon defendants' motion for summary judgment.
Defendants' remaining contention, that they are entitled to summary judgment dismissing plaintiff's informed consent claim against Takemoto, is meritless. Plaintiff's claim was premised upon Takemoto failing to obtain her informed consent to the closed reduction on January 31, 2018, including by failing to ensure that plaintiff understood the risks of that procedure and the alternatives to it. Defendants failed to meet their initial burden of showing that they were entitled to judgment as a matter of law on that claim, as the conflicting evidence annexed to their motion for summary judgment left it unclear as to "whether [Takemoto] had either disclosed the risks, benefits and alternatives to the [closed reduction] that a reasonable practitioner would have disclosed or that a reasonable person in [plaintiff's] position, fully informed, would have elected to undergo the [closed reduction]" (Mattison v OrthopedicsNY, LLP, 189 AD3d 2025, 2029 [3d Dept 2020] [internal quotations marks, brackets, ellipsis and citations omitted]). Thus, Supreme Court properly denied that aspect of defendant's motion "regardless of the sufficiency of the opposing papers[*6]" (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]).
Pritzker, Fisher, McShan and Powers, JJ., concur.
ORDERED that the orders are affirmed, with costs.

Footnotes

Footnote 1: A distal radius fracture "occurs when the radius — one of the two long bones in the forearm — breaks close to the wrist" (American Academy of Orthopedic Surgeons, Distal Radius Fractures [Broken Wrist], available at https://orthoinfo.aaos.org/en/
diseasesconditions/distal-radius-fractures-broken-wrist/ [last accessed Jan. 4, 2024]).

Footnote 2: Plaintiff also asserted claims against the physician's assistant who helped Takemoto perform the closed reduction on January 31, 2018 and others involved in her treatment, but subsequently discontinued the action as against those individuals. We limit our discussion to the individual defendants who remain in the case.

Footnote 3: Defendants suggest that Herbst could not be held liable in malpractice for the lack of alignment because she did not have a physician-patient relationship with plaintiff, but they overlook that an implied physician-patient relationship can arise when a physician communicates advice regarding a patient to another health care professional (see Liquori v Dolkart, 204 AD3d 1099, 1101 [3d Dept 2022]); Thomas v Hermoso, 110 AD3d 984, 985 [2d Dept 2013]). It is undisputed that Ostrander solicited an opinion from Herbst as to whether X-rays of plaintiff taken on February 14, 2018 showed maintained alignment of the fracture and, under the circumstances presented, questions of fact exist as to whether Herbst's opinion that it did gave rise to an implied physician-patient relationship between Herbst and plaintiff (see Rogers v Maloney, 77 AD3d 1427, 1429 [4th Dept 2010]); Santos v Rosing, 60 AD3d 500, 500 [1st Dept 2009]; Raptis-Smith v St. Joseph's Med. Ctr., 302 AD2d 246, 247 [1st Dept 2003]).