Brody v Bassett Healthcare Network

2026 NY Slip Op 02318

April 16, 2026

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

Harvey Brody, Individually and as Administrator of the Estate of Barbara Brody, Deceased, Appellant,

v

Bassett Healthcare Network, Respondent.

Decided and Entered:April 16, 2026

CV-25-1173

Calendar Date: February 19, 2026

Before: Garry, P.J., Clark, Pritzker, Mcshan And Corcoran, JJ.

Sussman & Associates, Goshen (Michael H. Sussman of counsel), for appellant.

Heidell, Pittoni, Murphy & Bach, LLP, Albany (Marshall Broad of counsel), for respondent.

[*1]

Pritzker, J.

Appeal from an order of the Supreme Court (John Lambert, J.), entered April 10, 2025 in Otsego County, which granted defendant's motion for summary judgment dismissing the complaint.

On Friday, July 23, 2021, Barbara Brody (hereinafter decedent) presented to FoxCare medical facility (hereinafter the facility), owned by defendant, complaining of worsening shortness of breath along with several other symptoms, including chest pain. Decedent was evaluated and examined by a nurse practitioner employed by defendant (hereinafter the NP), who noted that decedent had several chronic diseases including coronary artery disease, morbid obesity and Type 2 diabetes. In response to decedent's chief complaints, the NP performed an ECG FN1 which did not show significant changes from one that was conducted only two months earlier; the earlier ECG had shown a slowed heartbeat and a right bundle branch block. The NP then recommended that decedent return to the facility on Monday, July 26, 2021 for updated blood work to assist in ascertaining the root cause of her shortness of breath. On July 26, a warm summer day, decedent drove herself to the facility; she parked in a handicap parking spot near the entrance to the facility and proceeded to walk to the entrance. At the entrance, she was assisted by a security officer who provided her a wheelchair and transported her to the laboratory. From there, decedent was seen by a phlebotomist employed by defendant. After several attempts, the phlebotomist was unable to draw decedent's blood and instructed her to return to the facility the next day after hydrating. The phlebotomist then wheeled decedent back to her car in the parking lot where decedent was able to move herself into the driver's seat of her car and indicated to the phlebotomist that she was "fine." The phlebotomist did not wait for decedent to start her car and she returned to the facility. Nearly five hours later, around 5:15 p.m., decedent was discovered unresponsive in her car by a nurse employed by defendant. The nurse began CPR and called for more medical assistance. Unfortunately, resuscitation efforts failed.

Plaintiff, individually and as administrator of decedent's estate, commenced this action alleging that defendant's negligence in failing to properly supervise the parking lot and render timely medical care caused decedent's death. Discovery commenced and defendant moved to compel plaintiff to submit a certificate of merit or, if not, striking his claims sounding in medical malpractice. Despite plaintiff's opposition to this motion, Supreme Court (Burns, J.) granted defendant's motion (hereinafter the prior order) and plaintiff subsequently filed a certificate of merit. Thereafter, defendant moved for summary judgment dismissing the complaint, arguing that defendant did not owe decedent a duty to protect her in the parking lot and that defendant's agents did not depart from the standard of care in rendering medical treatment. Plaintiff opposed the motion[*2], and Supreme Court (Lambert, J.), finding that the prior order "ruled" that the case was one sounding in medical malpractice, granted defendant's motion. Specifically, the court found that defendant met its prima facie burden of establishing entitlement to judgment as a matter of law through its expert affidavit and that plaintiff's expert affidavit was insufficient to overcome defendant's showing. Furthermore, the court found that plaintiff improperly raised a new theory of liability in response to defendant's motion for summary judgment based on the NP's departure from the standard of care. Plaintiff appeals.

We turn first to plaintiff's contentions relative to the granting of defendant's motion for summary judgment as to plaintiff's claims sounding in common-law negligence. Initially, plaintiff and defendant agree, as does this Court, that Supreme Court erred in holding that the prior order "ruled" that this action sounded solely in medical malpractice and thereby erroneously precluded discussion of the negligence aspect of the case.FN2 As such, we turn first to the question of whether defendant's motion for summary judgment as to common-law negligence should be granted. As relevant here, "[t]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact" as to the presence of a duty, any breach of that duty or whether the breach was an actual or proximate cause of the harm (Thomas v Albany Hous. Auth., 216 AD3d 1381, 1381 [3d Dept 2023] [internal quotation marks and citations omitted]; see Myers v Home Energy Performance by Halco, 188 AD3d 1327, 1328-1329 [3d Dept 2020])."Failure to make such prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers" (McEleney v Riverview Assets, LLC, 201 AD3d 1159, 1160 [3d Dept 2022] [internal quotation marks and citations omitted]). If, however, the moving party satisfies its burden, "the burden then shifts to the nonmovant to demonstrate that a triable issue of fact exists" (Vickers v Parcells, 198 AD3d 1160, 1161 [3d Dept 2021] [internal quotation marks and citations omitted]). "As with any liability in tort, the scope of a hospital's duty is circumscribed by those risks which are reasonably foreseeable" (N.X. v Cabrini Med. Ctr., 97 NY2d 247, 253 [2002] [citations omitted]; see Ellis v Lansingburgh Cent. Sch. Dist., 163 AD3d 1146, 1147 [3d Dept 2018]).

In support of its motion for summary judgment, defendant submitted, among other proof, excerpts of decedent's medical record, deposition transcripts containing testimony from plaintiff, the security officer and the phlebotomist, decedent's death certificate, the security officer's work log from July 26, 2021 and an expert affirmation from Lawrence Solomon. The security officer testified that he sits in what used to be an information booth near the front doors at the main entrance [*3]of the facility. He explained that he is trained in the use of first aid CPR and the use of an AED, which is located approximately 50 feet from his booth. The security officer also testified that the handicap parking spaces are approximately 40 feet from his booth. As part of his job responsibilities, he conducts "tours" of defendant's parking lot throughout his shift, usually a "[c]ouple times a day." During these tours, he looks for anything "[i]rregular" or "out of place" and he stated that it is not a very big parking lot. He also explained that he does not walk through the parking lot, rather he walks on the sidewalk around the building and typically does his last round of the day around 3:00 p.m. to make sure all exterior doors are locked. Prior to decedent's death, the security officer did not have any knowledge of any deaths occurring in the parking lot, nor any instances where urgent medical care was required. He recalled that the day decedent died, he noticed her standing by the doors of the main entrance and asked her if she needed assistance with a wheelchair because she was elderly and looked "out of breath," which she accepted. He wheeled her to the lab registration window, where she remained in the wheelchair, and returned to his post at the front of the building. The security officer testified that he did not see her later exit through the facility doors near his booth. The security officer's work log from July 26, 2021 confirmed that he clocked in for his shift at 6:00 a.m., walked the complex hourly from 7:00 a.m. to 4:00 p.m. and observed no problems at any point. He transported several patients to various areas within the facility throughout the day including at 7:45 a.m., 9:15 a.m. and 12:30 p.m. The following day when the security officer arrived for his shift, he read the blotter report and became aware that hospital security was called down to the facility for an incident in the parking lot during which decedent was found unresponsive in her vehicle parked in a marked handicap spot.

The phlebotomist testified as to her interactions with decedent on the day she died. She explained that it is not unheard of that a phlebotomist may not be able to draw blood from a patient and that if a person has not had adequate food or water, he or she may be asked to leave the lab area to hydrate before trying again, or they may come back the next day. When she called decedent in for her blood draw, the phlebotomist noted that she was in a wheelchair. Despite several attempts, the phlebotomist was unable to draw decedent's blood and instructed her to come back the following day. The phlebotomist then wheeled decedent back outside to her car, via the entrance by the security booth, where decedent was able to get out of the wheelchair and into the car herself and told the phlebotomist that she was "fine." Lawrence Solomon, a physician, opined that patients who are discharged from defendant's facility are presumed stable and healthy enough to [*4]return home on their own. According to Solomon, decedent arrived at the facility on her own and, given the absence of any indication that she was unstable at the time of her release, the standard of care did not require the facility to monitor her once she reached her car. Thus, in Solomon's expert opinion, any failure of defendant to act was not a departure from the standard of care. Based on the foregoing, defendant met its prima facie burden such that the burden shifts to plaintiff to raise a dispute of material fact (see Inger v PCK Dev. Co., LLC, 97 AD3d 895, 897-898 [3d Dept 2012], lv denied 19 NY3d 816 [2012]).

In opposition to defendant's motion for summary judgment, plaintiff submitted, as relevant here, an affirmation in opposition to the motion, the job description written by defendant for its security officers and pictures of the handicap spaces wherein decedent's car was parked when she died. The security officer's job description as written explicitly requires security personnel to patrol the building and parking lots associated with their assigned areas. Furthermore, the description gives security personnel the responsibility for patrolling or maintaining watch at designated parking areas "for assistance and enforcement." Under the heading "Essential Job Functions" and the subheading "Security and Safety," security personnel are required to patrol all assigned areas including parking lots — not just the perimeter of the property — to check for suspicious occurrences. This responsibility is also reiterated in terms of their parking enforcement duties wherein security personnel are to perform "patrols of parking lots, or maintain[ ] watch at designated parking area for assistance and enforcement." Given the foregoing, plaintiff raised an issue of material fact such that summary judgment should have been denied as to the negligence claim. While defendant's security officer job description does not explicitly place upon its employees the duty to monitor patients leaving the building for medical emergencies, it does suggest that defendant assumed a duty to protect the safety and security of its patrons through their security personnel patrolling, among other areas, the facility parking lots. This runs directly contrary to the security officer's testimony that he was only required to patrol the perimeter of the facility. Additionally, the picture of the parking spot where decedent's car was parked illustrates that decedent sat in a hot car for several hours in a parking space within plain view of the security officer. Therefore, plaintiff raised issues of material fact as to the whether defendant assumed a duty in this case such that defendant's motion for summary judgment as to plaintiff's claim sounding in general negligence should have been denied (see Kirschler v Village of N. Collins, 229 AD3d 1264, 1266 [4th Dept 2024]; Hyer v Fuller, 107 AD3d 1235, 1236-1237 [3d Dept 2013]).

We turn now to plaintiff's contentions regarding Supreme [*5]Court's granting of defendant's motion for summary judgment as to the claims sounding in medical malpractice. In that regard, plaintiff first argues that the court erred in finding that he raised a new theory of recovery based upon the negligent actions of the NP who examined decedent on July 23, 2021, specifically failing to keep decedent for further observation and treatment after presenting in such a distressed state. "A plaintiff cannot raise a new or materially different theory of recovery against a party from those pleaded in the complaint and the bill of particulars for the first time in opposition to a motion for summary judgment" (Fasce v Catskill Regional Med. Ctr., 209 AD3d 1138, 1139-1140 [3d Dept 2022] [internal quotation marks and citations omitted]; see Henderson v Takemoto, 223 AD3d 996, 1001 [3d Dept 2024]). Thus, the inquiry distills to whether the theory of liability was asserted "in the complaint as amplified by the bill of particulars" (Conti v Albany Med. Ctr. Hosp., 159 AD2d 772, 773 [3d Dept 1990], lv denied 76 NY2d 702 [1990]; see Henderson v Takemoto, 223 AD3d at 1001). A review of the complaint and the bill of particulars demonstrates that although the complaint centers almost entirely around the events of July 26, 2021, there is an allegation of medical negligence against a "nurse" who knew of plaintiff's underlying medical conditions and failed to take appropriate action. Only two nurses were involved in the events surrounding decedent's death — the NP who examined decedent on July 23 and the nurse who found decedent unresponsive in her car on July 26. As such, it appears that it is the NP plaintiff is referring to here because through her treatment of decedent, she conducted an extensive review of her medical history.FN3 Additionally, the record does not show that the nurse who found decedent would have any such knowledge. Accordingly, given this context, it is evident from the pleadings that plaintiff intended to pursue claims of medical malpractice based on the NP's actions and thus it is not a new theory of liability (see Walker v Jamaica Hosp. Med. Ctr., 208 AD3d 714, 716 [2d Dept 2022]; compare Larcy v Kamler, 185 AD3d 564, 566 [2d Dept 2020]). As such, we turn to the merits of defendant's summary judgment motion.

"To meet the initial burden on a summary judgment motion in a medical malpractice action, the defendant[ ] must present factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that they complied with the accepted standard of care or did not cause any injury to the patient" (Marshall v Rosenberg, 196 AD3d 817, 818 [3d Dept 2021] [internal quotation marks, brackets and citations omitted]; see Cole v Champlain Val. Physicians' Hosp. Med. Ctr., 116 AD3d 1283, 1285 [3d Dept 2014]). If the defendant meets this burden, then "the burden shift[s] to [the] plaintiff to present expert medical opinion evidence that there was a deviation [*6]from the accepted standard of care and that this departure was a proximate cause of decedent's injury" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1080 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see Goldschmidt v Cortland Regional Med. Ctr., Inc., 190 AD3d 1212, 1214 [3d Dept 2021]).

In support of its motion for summary judgment, defendant proffered the deposition testimony of the NP wherein she discussed her examination of decedent on July 23, 2021. The NP testified that she is an adult-geriatric NP employed by defendant practicing at the facility and that she is assigned to a cardiologist employed by defendant, who is her collaborating physician. As a new patient, the NP recalled seeing decedent for approximately a 40-minute visit on July 23 to address decedent's complaints of shortness of breath. The NP noted decedent's chronic medical conditions and decedent's report that the shortness of breath had been on and off since January 2020, that she was also retaining fluid, experiencing intermittent chest pain and feeling exhausted. A physical examination of decedent as well as an ECG were conducted which revealed no significant change from her prior examination. She also extensively reviewed decedent's medical history including previous studies noted in her chart. Decedent's medical record indicates that the NP consulted with her consulting physician, who also reviewed the results of the ECG. The NP testified that she ordered decedent to return to the facility within the next few days to have blood work to rule out whether certain conditions were the cause of decedent's shortness of breath. Although the NP could not recall if she considered hospitalizing decedent, she indicated that she did recommend that decedent get the blood work done as soon as possible so they could get an idea of what was going on given decedent's gradually worsening symptoms. For his part, Solomon opined that considering the results of the NP's examination of decedent, combined with her conditions and recent complaints, the standard of care required that blood work be conducted as soon as possible. Given the limited hours of the lab on site, Solomon concluded that the NP did not depart from the standard of care when she directed decedent to return for blood work as soon as the lab was open again. Solomon also discussed that, by all accounts, decedent appeared in good health on July 26 and that the phlebotomist's inability to draw decedent's blood alone is not evidence that something is acutely wrong. The foregoing proof was sufficient to meet defendant's prima facie burden (see Schultz v Albany Med. Ctr. Hosp., 238 AD3d 1286, 1288-1289 [3d Dept 2025]; Kelly v Herzog, 224 AD3d 1189, 1191 [3d Dept 2024]).Thus, the burden shifted to plaintiff to raise an issue of material fact.

Plaintiff, in opposition, proffered, as relevant here, an expert affidavit from Arthur Fass, a licensed physician who is board certified in internal medicine [*7]and cardiology. In his expert affidavit, Fass opined that, based on his review of decedent's medical record as well as deposition testimony and other documentation related to this case, the NP's failure to order immediate hospital evaluation departed from the standard of care. Fass further explained that decedent presented to the NP with an extensive history of medical problems including diabetes, hypertension, chronic respiratory symptoms and many others. Her records also indicated that only seven weeks prior to her visit with the NP, decedent had a stent placed to resolve arterial blockage and decedent reported gaining approximately 20 pounds within the last two months. Based on her history and presentation as described, Fass concluded that these were likely signs of cardiac ischemia (lack of blood flow) and congestive heart failure thus necessitating immediate referral to a hospital for further evaluation and treatment. He further concluded that had the NP "ordered immediate hospital evaluation, [decedent] would have received the follow-up evaluation and care she needed." Accordingly, when viewed in the light most favorable to plaintiff, we find that the foregoing was sufficient to raise an issue of fact as to whether the NP's failure to order such hospitalization was a departure from the standard of care which contributed to decedent's death (see Lubrano-Birken v Ellis Hosp., 229 AD3d 873, 879 [3d Dept 2024]; Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1084).

Garry, P.J., Clark, McShan and Corcoran, JJ., concur.

ORDERED that the order is reversed, on the law, with costs, and motion denied.

Footnotes

Footnote 1: It is noted that ECG, as used throughout the record, and EKG are abbreviations for the same test, which measures the electrical activity of the heart.

Footnote 2: To be clear, there appears to be no dispute that plaintiff's theory of liability sounds in negligence as to the monitoring of the parking lot and medical malpractice as to decedent's treatment at the hospital.

Footnote 3: We note that, in Soloman's expert affidavit in support of defendant's motion for summary judgment, he did specifically discuss the examination by the NP on July 23, 2021.